521 F.2d 1269
 1975-2 Trade Cases 60,464
 LONG ISLAND LIGHTING COMPANY, Appellant,
v.
STANDARD OIL COMPANY OF CALIFORNIA et al., Appellees.
CONSOLIDATED EDISON COMPANY OF NEW YORK, INC., Appellant,
v.
STANDARD OIL COMPANY OF CALIFORNIA et al., Appellees.
 Nos. 1118, 1119, Dockets 75-7177, 75-7178.
 United States Court of Appeals,
Second Circuit.
 Argued June 18, 1975.
Decided Aug. 22, 1975.
 
 Lord, Day & Lord, New York City, for appellees Standard Oil Co. of California and Chevron Oil Trading Co.; G. Kenneth Handley, Gordon D. Spivack, John W. Castles, 3d, Harry G. Sklarsky, David H. Marks, Carolyn T. Ellis, New York City, Pillsbury, Madison & Sutro, San Francisco, Cal., Turner H. McBaine, Wallace L. Kaapcke, Thomas E. Haven, San Francisco, Cal., of counsel.
 Donovan, Leisure, Newton & Irvine, New York City, for appellee Mobil Oil Corp.; Sanford M. Litvack, James A. Magee, Benjamin Vinar, New York City, of counsel.
 Debevoise, Plimpton, Lyons & Gates, New York City, for appellee Texaco Overseas Petroleum Co.; Robert V. von Mehren, Irwin J. Sugarman, New York City, of counsel.
 Rosenman, Colin, Kaye, Petscheck, Freund & Emil, New York City, for appellants; Asa D. Sokolow, David W. Cohen, Charles A. Soberman, Paul E. Levine, New York City, of counsel.
 Kaye, Scholer, Fierman, Hays & Handler, Charles F. Kazlauskas, Jr., New York City, for appellee Texaco Inc.; Milton Handler, Milton J. Schubin, Daniel E. Lazaroff, New York City, of counsel.
 Before GIBBONS,* GURFEIN and MESKILL, Circuit Judges.
 GIBBONS, Circuit Judge:
 
 
 1
 This is a consolidated appeal by Long Island Lighting Company (LILCO), and Consolidated Edison Company of New York, Inc. (CON EDISON). Both companies were plaintiffs in separate antitrust actions which had been consolidated for trial in the district court. That court granted the defendants' joint motion, pursuant to Rule 12(b)(6), Fed.R.Civ.P., to dismiss the first and second counts of the LILCO complaint and the first count of the CON EDISON complaint.[1] We affirm the dismissal of the first count in both complaints, but reverse the dismissal of the second count of the LILCO complaint and remand that claim to the district court for further proceedings.
 
 
 2
 The plaintiffs LILCO and CON EDISON are public utilities that generate and distribute electricity for consumption in the State of New York. The defendants are three integrated petroleum companies and two of their subsidiaries: Standard Oil Company of California (SOCAL) and its wholly-owned subsidiary Chevron Oil Trading Company; Texaco, Inc. (TEXACO) and its wholly-owned subsidiary Texaco Overseas Petroleum Company; and Mobil Oil Corporation (MOBIL).
 
 
 3
 In order to generate electricity, LILCO and CON EDISON purchase low sulphur residual fuel oil which is produced in the course of refining low sulphur crude oil. Environmental regulations require that utilities burn low sulphur residual fuel oil in most of their fossil fuel generating plants. This case grows out of the very sharp increase in price of that grade of oil beginning late in 1973, and it presents the issue whether LILCO and CON EDISON may recover damages under § 4 of the Clayton Act, 15 U.S.C. § 15, or obtain injunctive relief under § 16 of the Clayton Act, 15 U.S.C. § 26, by reason of the actions of the defendants alleged in the complaint. The allegations of the first count of each complaint are identical for all purposes relevant to this appeal and will be treated together. The second count of the LILCO complaint requires separate treatment. However, with respect to each count, the question presented is whether a Rule 12(b)(6) motion to dismiss was properly granted.
 
 I. The First Count
 
 4
 In addition to the parties in this action, the complaints refer to activities by the following:
 
 
 5
 LIBYA The Libyan Arab Republic, in which are located deposits of low sulphur crude oil.
 
 
 6
 NOC The Libyan National Oil Company, an oil corporation owned by the Libyan government.
 
 
 7
 AMOSEAS American Overseas Petroleum Limited, a company jointly owned by SOCAL and TEXACO, which in 1973, was engaged in crude oil drilling and producing in Libya at oil concessions granted by that government.
 
 
 8
 ARAMCO Arabian American Oil Company, a company jointly owned by SOCAL, TEXACO, MOBIL, Exxon corporation, and the government of Saudi Arabia, engaged in the production, refining and transportation of crude oil produced in Saudi Arabia, a Persian Gulf state.
 
 
 9
 OPEC The Organization of Petroleum Exporting Countries, an organization of certain Asian, African and Latin American countries, which account for the bulk of the known world crude oil reserves, of which Libya and Saudi Arabia are members.
 
 
 10
 LPG The London Policy Group, a group of major oil companies with interests in OPEC countries formed in January 1971 to plan policy with respect to, and to bargain jointly with, the OPEC countries.
 
 
 11
 NEPCO New England Petroleum Corporation, one of the largest independent importers, refiners and distributors of petroleum products in the United States.
 
 
 12
 NEPCO has been LILCO's sole supplier of residual oil requirements since 1960, and a major supplier of CON EDISON since 1967. In 1967 SOCAL entered into a long term supply agreement with NEPCO whereby it agreed to supply NEPCO with substantially all of its share of AMOSEAS' output of low sulphur Libyan crude oil and to deliver it to a refinery in the Bahamas that would be owned 65% By NEPCO and 35% By SOCAL. This long term supply agreement induced LILCO and CON EDISON to enter into long term supply agreements for low sulphur oil with NEPCO, which extend to 1980. The effect of the SOCAL-NEPCO agreement was to make SOCAL's share of AMOSEAS low sulphur oil a major source of low sulphur oil for the East Coast of the United States. By September, 1973, when low sulphur fuel was in extremely short supply, the Libyan source became the only available supply.
 
 
 13
 However, in August, 1973 the government of Libya had demanded that NOC, its state-owned production company have a 51% Interest in the oil companies' rights under their Libyan concession agreements. The Libyan demand became a matter of great concern to the London Policy Group (LPG). The LPG, it will be recalled, had been founded in January, 1971 by the defendants and other oil companies to present a common front to OPEC. It was agreed that if an OPEC country nationalized one of LPG's member's interests, the other members would endeavor to make up the losses. This policy of concerted action was put to the test in the face of the Libyan demands. However, a split developed between those LPG members whose primary interests were in the Persian Gulf, the center of major production, and who held only secondary interests in Libya, (the "chiefs"), and those smaller independent companies whose primary interest was in the less substantial Libyan production. The smaller independents decided to acquiesce to the Libyan demands while the "chiefs" refused. The complaints allege in identical language:
 
 
 14
 "SOCAL, TEXACO, MOBIL and other major LPG members received similar offers (as had the smaller independents) from the Government of Libya for a 51% Participation by NOC in their Libyan interests. In their judgment, however, a grant of a 51% Interest in their Libyan holdings would have jeopardized their far more vast and more valuable holdings in the Persian Gulf area, where they had succeeded in negotiating much more favorable agreements, including that with the Government of Saudi Arabia for a 25% Participation in ARAMCO. Accordingly, SOCAL, TEXACO, MOBIL and other major LPG members concertedly decided to reject and did reject this proposal of the Libyan Government."
 
 
 15
 (LILCO Complaint P 31, Joint App. at 11a-12a; CON EDISON Complaint P 30, Joint App. at 34a-35a).
 
 
 16
 The Libyan proposal having been rejected by the defendants, that government announced that it would nationalize a 51% Interest. Thereupon, to summarize the allegations of the complaint, the defendants organized a group boycott of Libyan oil, refusing to lift Libyan oil, or to transport it to the Bahamas refinery, and attempting to prevent NEPCO from obtaining it.
 
 
 17
 After the group boycott commenced NEPCO entered into negotiations with NOC for the purchase of the approximate quantity of low sulphur crude oil that SOCAL had previously been supplying, but at substantially higher prices and on less favorable terms. Since SOCAL had withdrawn its tankers pursuant to the alleged group boycott, NEPCO also had to make more costly transportation arrangements. NEPCO notified LILCO and CON EDISON that the replacement oil would be offered at substantially higher prices. LILCO and CON EDISON, unable to obtain low sulphur residual oil from other sources, agreed to purchase the NOC oil refined by NEPCO.[2]
 
 
 18
 The plaintiff utilities allege that by virtue of a fuel adjustment provision contained in their tariff schedules establishing rates for electric power a portion of these fuel price increases is passed on to their customers, but they also allege that they have incurred increased costs, substantial losses in business from present and potential subscribers to their electric services, and impairment of investor confidence resulting in increased cost of marketing their securities.
 
 
 19
 Thus, construing the complaint in the light most favorable to the plaintiffs, the first count charges that the defendants, motivated by their interest in strengthening their position in dealing with Saudi Arabia, organized a group boycott against Libyan oil in an effort to dissuade the Libyan government from nationalizing 51% Of their oil concessions; that pursuing the boycott of Libyan oil they stopped delivering it to NEPCO; that NEPCO obtained it directly from NOC at higher prices, and that LILCO and CON EDISON were forced to pay these higher prices.
 
 
 20
 The district court concluded that those allegations were insufficient to state a claim upon which relief could be granted under §§ 4 & 16 of the Clayton Act. It reached this conclusion for two reasons. First, it held that the allegations of the first count placed the plaintiffs outside the "target area" of defendants' alleged boycott, and hence without standing to bring a private antitrust action pursuant to the Clayton Act.[3] (Joint App. at 173a-74a). Second, it held that the first count did not sufficiently allege an injury to any interest of the plaintiffs protected by the antitrust laws, because there was no causal connection between the defendants' activities and the injuries alleged, and because these electric utilities, being natural monopolies, could not be injured in their competitive position in the electric utility business.[4] (Joint App. at 174a-75a). We affirm on the first ground because we conclude that under this circuit's cases on standing, LILCO and CON EDISON were not in the "target area" of the group boycott alleged in the first count.
 
 
 21
 Recognizing that any antitrust violation may produce ripple effects of injury quite far removed from the immediate target of the violation, this court in the cases listed in note 3 in the margin has held that some practical rules of standing must exclude remote parties with possibly speculative injuries. As the rather frequent dissents and concurrences in those cases indicate, the line between plaintiffs with standing and those who lack it may not in every case seem perfectly plain. But the "target area" standing rule is well-established. The policies which favor it are set forth in detail in Judge Mansfield's opinion in Calderone Enterprises Corp. v. United Artists Theatre Circuit, Inc., 454 F.2d 1292 (2d Cir. 1971), cert. denied, 406 U.S. 930, 92 S.Ct. 1776, 32 L.Ed.2d 132 (1972), and need not be repeated here. Under the rule even parties whose injuries may be both immediate and foreseeable may lack standing to pursue a private remedy if that injury is indirect or incidental, or if their business was not in the target area of the allegedly illegal acts.
 
 
 22
 In this case the first count alleges a group boycott aimed primarily at Libya and secondarily at Saudi Arabia. It was foreseeable, certainly, that in the short run this boycott would have some effect, possibly adverse, on the business or property of NEPCO, and on the business and property of NEPCO's customers, LILCO and CON EDISON. But LILCO and CON EDISON were not the objects of the alleged antitrust violation. Their injuries were the result of their relationship to NEPCO, an intermediate non-target. The cases recognize that suppliers,[5] stockholders,[6] employees,[7] landlords,[8] franchisors,[9] licensors,[10] and consumers[11] are too remote for Clayton Act standing. The instant plaintiffs, customers of a non-target, are at least equally remote. The district court correctly held that LILCO and CON EDISON were too remote from the target area of the allegedly illegal group boycott for Clayton Act standing, and we affirm the dismissal of the first counts on that ground. Since that holding adequately supports the judgment appealed from, it is not necessary to pass upon the district court's alternative ground, or to consider the other defenses tendered by the defendants but not decided by the district court.[12]
 
 
 23
 LILCO and CON EDISON would have us surmount the standing hurdle by construing the first counts as if they alleged a group boycott directed at them. For this they rely upon the allegation:
 
 
 24
 "After notification by NEPCO of its price increase, CON EDISON tried to obtain low sulphur residual oil from other sources. No major member of the LPG submitted an offer."[13] (CON EDISON Complaint P 48; Joint App. at 39a).
 
 
 25
 However, this is not a group boycott allegation. It does not suggest that any defendant was actually asked for low sulphur residual oil, that any defendant actually refused to sell it, or that any action of the defendants with respect to the sale of low sulphur residual oil to LILCO or CON EDISON was taken in concert. At no time did the plaintiffs seek leave in the district court to amend their complaints. Nor did they urge upon the district court the contention that the quoted allegation should be read as a charge of a group boycott directed at them. Under these circumstances we decline to consider that theory as a basis for reversing the judgment appealed from.
 
 II. LILCO's Second Count
 
 26
 In disposing of the second count of the LILCO Complaint the district court stated:
 
 
 27
 "The decision as to this (first count) claim will necessarily govern as to the second claim of the complaint in the LILCO action . . .." (Joint App. at 166a).
 
 
 28
 Thus it made no separate analysis of LILCO's standing to plead the second count. Probably the court's ruling was the result of a somewhat equivocal colloquy which took place at the oral argument on the joint motions held on February 24, 1975. Several motions were pending in addition to the joint Rule 12(b)(6) motion which resulted in the order appealed from. The court asked if counsel had any objection to its consideration of the Rule 12(b)(6) motion first, since it might moot the others. The judge was advised that there was no objection. The court next suggested that the argument be confined to the first count of the LILCO complaint, since
 
 
 29
 "the decision on the points raised by the joint motion as to this first claim in the LILCO complaint will necessarily govern as to the second claim in that same complaint and as to the first claim in the Con Ed complaint." (Joint App. at 112a) (emphasis supplied).
 
 
 30
 Counsel for LILCO did not object.
 
 
 31
 The defendants would have us construe this colloquy as the equivalent of a stipulation by LILCO that the disposition of the first count would control the disposition of the second. Possibly the district court so understood it, although the opinion does not say as much. We think, however, that the record is entirely too equivocal to bind LILCO to a stipulation resulting from its counsel's silence when confronted during the argument of opposing counsel with a suggestion by the court, the full import of which may have escaped counsel's attention. Moreover, the court's statement was at least partially accurate, since the ruling on LILCO's first count would necessarily govern CON EDISON's first count. However, for reasons which we will discuss, the italicized language in the court's statement referring to the "second claim in (the LILCO) complaint" is inaccurate. We have not been referred to any record reference which establishes that LILCO's counsel in the heat of forensic battle in the courtroom was even aware of the significance of the court's misstatement. Thus we do not think LILCO is bound by counsel's acquiescence.
 
 
 32
 The defendants also urge, however, that the same ruling with respect to LILCO's standing must be made on the second count as well, and that we should therefore affirm the dismissal of that count even though the district court made no separate analysis of it. There are, however, significant differences between the two counts. The second count repeats the jurisdictional, party, and damage allegations of the first count and also repeats the following allegation:
 
 
 33
 "After notification by NEPCO of its price increase, LILCO tried to obtain low sulphur residual oil from other sources. No member of the LPG submitted an offer." (LILCO Complaint P 48; Joint App. at 16a).
 
 It then alleges:
 
 34
 "Defendants SOCAL, TEXACO and MOBIL, acting individually and in concert with each other and with (others), have monopolized, have attempted to monopolize, and have conspired to monopolize the market in the East Coast of the United States for the production and sale of low sulphur crude oil and all products made therefrom . . ..
 
 
 35
 Defendants have used this monopoly power to limit the supply of petroleum products available to the consuming public and to fix and maintain the prices for these products at unreasonable and artificially high levels. Although defendants were aware of and knew that increasing environmental concern has led and will lead to the requirement that public utilities use only low sulphur distillate and residual oil in their plants, defendants have kept the supply of such petroleum products down and the price for such products up. They have accomplished this, in part, by choosing not to exploit deposits of low sulphur crude oil and by limiting the capacity to refine high sulphur crude oil into low sulphur petroleum products.
 
 
 36
 As a result of the foregoing conspiracy, acts and practices, LILCO has been damaged by having had to pay inflated, artificially high prices for its low sulphur distillate and residual oil requirements. LILCO has no present knowledge of the amount of overcharge that has resulted from such unlawful acts and practices. The facts regarding such overcharge are solely within the knowledge and control of defendants and their co-conspirators. After discovery of those facts, LILCO will amend this complaint to set forth its damages specifically." (LILCO Complaint PP 58, 61, 62; Joint App. at 19a-21a).
 
 
 37
 The second count, in marked contrast to the first, moves the target area of the alleged conspiracy from Saudi Arabia and Libya to the East Coast of the United States. It charges a conspiracy to reduce supply and inflate prices charged to electric utilities. Clearly LILCO is within the target area of such a conspiracy.
 
 
 38
 The defendants would have us hold that NEPCO, not LILCO, is the actual target, and that LILCO still lacks standing. But we are dealing here with a Rule 12(b) (6) motion. The second count does not allege the NEPCO-LILCO relationship. Moreover, it alleges that there are other unnamed conspirators. The first count alleges, and it is apparently undisputed, that SOCAL has a 35% Interest in NEPCO's Bahamian refinery. If the conspiracy alleged in the second count actually exists, NEPCO may not be its victim, but rather a member. If that should prove to be the case nothing in the Supreme Court's decision in Hanover Shoe, Inc. v. United Shoe Machinery Corp., 392 U.S. 481, 88 S.Ct. 2224, 20 L.Ed.2d 1231 (1968) on which defendants rely, would preclude a § 4 Clayton recovery by NEPCO's customers.
 
 
 39
 The defendants also suggest that LILCO's second count may run afoul of the "pass through" defense since its fuel charges are reflected in its rates. Whatever may be left of that defense since Hanover Shoe, Inc. v. United Shoe Machinery Corp., supra,[14] the damage allegations pleaded here, including loss of customers, impairment of financial integrity, and increased cost of marketing its securities, cannot be said as a matter of law to fall within the pass through category.
 
 
 40
 We hold, then, that it was improper to grant a Rule 12(b)(6) motion dismissing the second count of the LILCO complaint. In so holding we do not suggest that the count may not be disposed of on a motion for summary judgment if its rather conclusory allegations should prove to be entirely groundless.
 
 III. Conclusion
 
 41
 The judgment dismissing the first count of the CON EDISON complaint will be affirmed. The judgment dismissing the first count of the LILCO complaint will be affirmed. The judgment dismissing the second count of the LILCO complaint will be reversed and that count remanded to the district court for further proceedings.
 
 
 
 *
 United States Circuit Judge for the Third Circuit, sitting by designation
 
 
 [1]
 In each case a state law claim against SOCAL for interference with a contractual relationship remains undisposed of. The district court expressly determined, pursuant to Rule 54(b), Fed.R.Civ.P., that there was no just reason for delaying the entry of final judgments. Thus we have jurisdiction under 28 U.S.C. § 1291
 
 
 [2]
 The district court took judicial notice that LILCO has pending in the New York Supreme Court, Nassau County, a suit against NEPCO for breach of contract for failure to deliver at prices within the range established in the long term supply contract
 
 
 [3]
 See Nassau County Ass'n of Ins. Agents, Inc. v. Aetna Life & Cas. Co., 497 F.2d 1151 (2d Cir.), cert. denied, 419 U.S. 968, 95 S.Ct. 232, 42 L.Ed.2d 184 (1974); GAF Corp. v. Circle Floor Co., Inc., 463 F.2d 752 (2d Cir. 1972), cert. dismissed, 413 U.S. 901, 93 S.Ct. 3058, 37 L.Ed.2d 1045 (1973); Calderone Enterprises Corp. v. United Artists Theatre Circuit, Inc., 454 F.2d 1292 (2d Cir. 1971), cert. denied, 406 U.S. 930, 92 S.Ct. 1776, 32 L.Ed.2d 132 (1972); Billy Baxter, Inc. v. Coca-Cola Co., 431 F.2d 183 (2d Cir. 1970), cert. denied, 401 U.S. 923, 91 S.Ct. 877, 27 L.Ed.2d 826 (1971); SCM Corp. v. Radio Corp. of America, 407 F.2d 166 (2d Cir.), cert. denied, 395 U.S. 943, 89 S.Ct. 2014, 23 L.Ed.2d 461 (1969)
 
 
 [4]
 For the conclusion that a private plaintiff must allege injury to his competitive position, the district court relied on GAF Corp. v. Circle Floor Co., Inc., 463 F.2d 752 (2d Cir. 1972). Our affirmance should not be construed as approving the district court's interpretation of the GAF holding, since on the basis on which we decide this case there is no occasion to reach that issue
 
 
 [5]
 Billy Baxter, Inc. v. Coca-Cola Co., 431 F.2d 183 (2d Cir. 1970), cert. denied, 401 U.S. 923, 91 S.Ct. 877, 27 L.Ed.2d 826 (1971)
 
 
 [6]
 Bookout v. Schine Theatres, Inc., 253 F.2d 292 (2d Cir. 1958)
 
 
 [7]
 Westmoreland Asbestos Co. v. Johns-Mansville Corp., 113 F.2d 114 (2d Cir. 1940) (per curiam), aff'g 30 F.Supp. 389, 391 (S.D.N.Y.1939)
 
 
 [8]
 Calderone Enterprises Corp. v. United Artists Theatre Circuit, Inc., 454 F.2d 1292 (2d Cir. 1971), cert. denied, 406 U.S. 930, 92 S.Ct. 1776, 32 L.Ed.2d 132 (1972)
 
 
 [9]
 Billy Baxter, Inc. v. Coca-Cola Co., 431 F.2d 183 (2d Cir. 1970), cert. denied, 401 U.S. 923, 91 S.Ct. 877, 27 L.Ed.2d 826 (1971)
 
 
 [10]
 Productive Inventions, Inc. v. Trico Products Corp., 224 F.2d 678, 679 (2d Cir. 1955), cert. denied, 350 U.S. 936, 76 S.Ct. 301, 100 L.Ed. 818 (1956)
 
 
 [11]
 United Egg Producers v. Bauer International Corp., 312 F.Supp. 319 (S.D.N.Y.1970)
 
 
 [12]
 These include the contention that the price increase was the result of an act of state by Libya (see Banco Nacional de Cuba v. Sabbatino, 376 U.S. 398, 84 S.Ct. 923, 11 L.Ed.2d 804 (1964)), and the contention that only the first purchaser from an antitrust violator may recover under the antitrust laws
 
 
 [13]
 The LILCO allegation is substantially identical. See LILCO Complaint P 48, Joint App. at 16a. See p. 14 infra, Part II
 
 
 [14]
 See cases collected in Annot., Liability in Damages for Price-Fixing in Violation of Federal Antitrust Laws as Affected by Plaintiff's Passing Excessive Charges onto His Own Customers, 1 A.L.R.Fed. 500 (1969)