**Irving SULMEYER and Arnold L. Kupetz, Co-Trustees of the Estate of Bubble Up International, Ltd., Debtor, Plaintiffs,**

**v.**

**The SEVEN–UP COMPANY and Seven-Up Export Corporation, Defendants.**

**No. 68 Civ. 2246.**

United States District Court, S. D. New York.

March 26, 1976.

Bondy & Schloss, Jeffrey Glatzer, New York City, Lawrence J. Appel, Law Offices of Joseph L. Alioto, San Francisco, Cal., for plaintiffs.

Wachtell, Manheim & Grouf, Robert Braunschweig, New York City, Arent, Fox, Kintner, Plotkin & Kahn, Eugene Meigher, Daniel Kaufman, Washington, D. C., for defendants.

1. The plaintiffs will also be referred to as "Bubble Up."

2. After this lawsuit began, Seven-Up Export's name was changed to Seven-Up International,

## MEMORANDUM

STEWART, District Judge:

Plaintiffs, Irving Sulmeyer and Arnold L. Kupetz, who are the co-trustees of the Estate of Bubble Up, International, Ltd. ("Bubble Up"),[1] an Illinois corporation now in Chapter X reorganization proceedings, have brought an action against defendants, Seven-Up Company ("Seven-Up") and Seven-Up Export Corporation ("Export"),[2] alleging that, since 1957, the two have engaged in a combination and conspiracy to restrain trade and to monopolize the production, sale and distribution of concentrates for lemon/lime soft drinks, in violation of §§ 1 and 2 of the Sherman Act. 15 U.S.C. § 1 and § 2.

Prior to May of 1973, when plaintiffs sold Bubble Up's income-producing assets, Bubble Up was in the business of supplying concentrate to franchised bottlers in foreign countries for use in the production of a lemon/lime soft drink sold under the trade name "Bubble Up." [Complaint, ¶ 3]. Defendants, engaged in a similar business, are the "dominant seller" in the lemon/lime market, accounting for approximately 45% of the industry's sales. [Complaint, ¶ 8]. Plaintiffs allege that defendants' agreements with bottlers in foreign countries, which prohibit bottlers from producing soft drinks of the same flavor as that of defendants, functioned to preclude Bubble Up from access to markets and resulted in creating a monopoly and in restraining trade. [Complaint, ¶ 9–10]. In furtherance of the plan, defendants allegedly instituted baseless litigation against Bubble Up and threatened those who "expressed an interest in bottling Bubble Up." [Complaint, ¶ 13(a) and (b)]. Plaintiffs allege damage in excess of $1,000,000 and seek injunctive relief as well.

Plaintiffs have moved for partial summary judgment, arguing that *per se* violations of § 1 and § 2 of the Sherman

Inc., but the parties have continued to refer to it as "Export" and we shall do the same.

Act have been shown by the agreements between Seven-Up and bottlers and by deposition testimony of defendants' executives; plaintiffs claim that the only issues which require a trial are the questions of impact and damages. Defendants have cross-moved for partial summary judgment, contesting plaintiffs' standing to bring suit, alleging that the two named defendants constitute one business entity, and opposing plaintiffs' motion on the grounds that triable issues remain. We consider the motions together.

In defense of plaintiffs' motion for partial summary judgment, defendants contest plaintiffs' ability to bring this litigation on two grounds. First, defendants argue that plaintiffs lack standing to assert claims which allege unlawful activity in the marketing and distribution of soft drinks in foreign countries because plaintiffs' business was only that of supplying concentrate to and enfranchising bottlers. Second, defendants argue that the United States antitrust laws have no application to injury which relates to commerce in foreign nations.

■ In support of their first contention, defendants turn the court's attention to *Billy Baxter, Inc. v. Coca-Cola Company*, 431 F.2d 183 (2d Cir. 1970), *cert. denied*, 401 U.S. 923, 91 S.Ct. 877, 27 L.Ed.2d 826 (1971), which held that a plaintiff was outside the "target area" of the alleged anticompetitive activities and therefore lacked standing to bring suit. In *Billy Baxter*, a franchisor, who was in the business of licensing information needed for the manufacture of beverages, and supplying some raw materials, but who left the production of the soft drinks to independent franchisees, was not permitted to assert antitrust claims against the Coca-Cola and the Canada Dry Corporation, who had allegedly coerced the retail customers of the franchisees into refusing Billy Baxter soft drinks.[3] Seven-Up claims that the facts here are parallel because Bubble Up only engaged in a similarly limited business of supplying franchisees but has alleged injuries related to unlawful conduct in the distribution and marketing of the product.

However, unlike the plaintiff in *Billy Baxter*, Bubble Up has asserted that it, like defendants, manufactured concentrates, franchised bottlers, supplied advertising and promotional material, offered substantial assistance to its franchisees, and was actively involved in supervising the work of the franchisees.[4] Plaintiffs allege that Bubble Up was directly in competition with defendants, that defendants have directly sought to limit not only Bubble Up's franchisees but also Bubble Up itself, and to that end, defendants have instituted litigation in foreign countries and coerced bottlers who were potential franchisees of plaintiffs. In so far as the facts have developed at this juncture,[5] we do not believe

3. The *Billy Baxter* holding was recently restated by the Second Circuit in *Long Island Lighting Co. v. Standard Oil Co. of California*, 521 F.2d 1269 (2d Cir. 1975); certiorari denied, 423 U.S. 1073, 96 S.Ct. 855, 47 L.Ed.2d 83 (1976),

". . . [T]he line between plaintiffs with standing and those who lack it may not in every case seem perfectly plain. But the 'target area' standing rule is well-established. . . . [E]ven parties whose injuries may be both immediate and foreseeable may lack standing to pursue a private remedy if that injury is indirect or incidental, or if their business was not in the target area of the allegedly illegal acts." 521 F.2d at 1274.

4. In contrast, Billy Baxter admitted its "circumscribed role" in the product distribution of the soft drink. *See* 431 F.2d at 185. It had no plant but functioned only with an administrative office. Despite its own limited operations, the Baxter complaint "sweepingly alleged" that defendants, Coca-Cola and Canada Dry, violated various portions of the antitrust laws. Specifically, Baxter claimed harm because defendants had coerced its "customers." 431 F.2d at 186. However, the Second Circuit found that none of those at whom the alleged illegal activities were aimed were the customers of Billy Baxter, Inc. "Instead, each was a retail outlet or distributor which had purchased beverages from one of the franchised bottlers, which in turn paid royalties to" Billy Baxter. 431 F.2d at 186.

5. *See Carnivale Bag Co., Inc. v. Slide-Rite Manufacturing Corp.*, 395 F.Supp. 287, 294 (S.D.N.Y.1975).

that this is an instance where we are asked to trace an ingredient "from supplier to manufacturer to distributor to retailer" [*Bray v. Safeway Stores, Inc.*, 392 F.Supp. 851, 863 (N.D.Cal.1975)] in order to perceive the alleged harm to a plaintiff. Nor do we conclude that the harm alleged is either incidental, derivative or too remote to permit this action to continue. Thus, we hold that plaintiffs made sufficient allegations of personal and direct harm to have standing to maintain this suit.[6]

■ Defendants also argue that plaintiffs have failed to establish the requisite jurisdictional nexus between the activities of defendants and the United States antitrust laws because the only unlawful conduct alleged involved the internal commerce of foreign nations. However, "[a] conspiracy to monopolize or restrain the domestic or foreign commerce of the United States is not outside the reach of the Sherman Act just because part of the conduct complained of occurs in foreign countries." *Continental Ore Co. v. Union Carbide & Carbon Co.*, 370 U.S. 690, 704, 82 S.Ct. 1404, 1413, 8 L.Ed.2d 777, 787 (1962) (citations omitted). Here, plaintiffs have alleged substantial impact on their United States business and property and upon trade and commerce between the United States and foreign countries. Further, the alleged antitrust violations relate to anticompetitive practices between plaintiffs and defendants, both of which are American corporations. Finally, the challenged conduct includes actions taken with the United States. Thus, we cannot conclude that, as a matter of law, the alleged illegalities did not have "impact within the United States and upon its foreign trade." *Continental Carbide, supra*, 370 U.S. at 705, 82 S.Ct. at 1414, 8 L.Ed.2d at 787. We find the alleged injuries to be within the reach of the antitrust laws.

■ Defendants' motion for partial summary judgment is predicated upon the assertion that, as a matter of law, the two named defendants cannot conspire with each other because they are one business entity. *See Sunkist v. Winckler & Smith Co.*, 370 U.S. 19, 82 S.Ct. 1130, 8 L.Ed.2d 305 (1962). While motions for summary judgment "should be used sparingly in complex antitrust litigation," [*Poller v. Columbia Broadcasting System, Inc.*, 368 U.S. 464, 473, 82 S.Ct. 486, 491, 7 L.Ed.2d 458, 464 (1962)], we believe that in this instance, partial summary judgment is appropriately granted. We note that, unlike *Poller, supra*, we are not dealing with questions of intent and motive, determination of which rests largely upon the credibility of witnesses, but rather with the question of the relationship between Seven-Up and Export. Defendants have presented to us the affidavit of Leslie R. Scott, former general manager, president, and presently a consultant of Export, and the agency agreement between Seven-Up and Export ("Agency Agreement"). Both documents substantiate defendants' claim that Export was created to be, functioned as, and never acted in any manner other than as an agent for Seven-Up. Prior to 1948, the foreign franchising of Seven-Up concentrate was handled by one of Seven-Up's vice-presidents. Immediately upon incorporation of Export, an Agency Agreement was entered into between Seven-Up and Export in which Export was designated as Seven-Up's "general agent to promote

6. Compare *Nassau City Association of Insurance Agents, Inc. v. Aetna Life & Casualty Co.*, 497 F.2d 1151 (2d Cir. 1974), *cert. denied*, 419 U.S. 968, 95 S.Ct. 232, 42 L.Ed.2d 184 (1974) in which it was held that plaintiffs did not have standing because they had not pointed to any direct injury resulting from defendants' acts or made a showing that they were within the target area. As the plaintiffs were neither doing business with nor in competition with defendants, the Second Circuit concluded that the only alleged injury, a decrease in membership and dues allegedly resulting from acts of defendants' agents, was too remote to permit plaintiffs to have standing under the Clayton Act. *See also Calderone Enterprises Corp. v. United States Theatre Circuit*, 454 F.2d 1292 (2d Cir. 1971), *cert. denied*, 406 U.S. 930, 92 S.Ct. 1776, 32 L.Ed.2d 132 (1972) and *Productive Inventions v. Trico Products Corp.*, 224 F.2d 678 (2d Cir. 1955), *cert. denied*, 350 U.S. 936, 76 S.Ct. 301, 100 L.Ed. 818 (1956).

. . . [Seven-Up's] business . . . outside the United States." [Agency Agreement, ¶ 1].[7] Export was permitted to manufacture concentrate only with the consent of Seven-Up. [Agency Agreement, ¶ 4]. Export had the right to copy Seven-Up's advertising but could not deviate from the format without Seven-Up's permission. [Agency Agreement, ¶ 7]. Export was empowered with the right to use Seven-Up's trademarks but Seven-Up retained the ownership of such marks. [Agency Agreement, ¶ 9]. Export was required to diligently "further the interest of" Seven-Up [Agency Agreement, ¶ 11] and was obligated to "engage in no other business which is competitive directly or remotely with the business of Seven-Up.[8] [Agency Agreement, ¶ 15]. Finally, Export was required to make periodic reports to Seven-Up and to permit full inspection of its records. [Agency Agreement, ¶ 16].

With two exceptions, all of the directors of Export have been either officers or directors of Seven-Up. [Scott Affidavit, ¶ 4]. Further, Scott's affidavit provides evidence that Export never functioned as an independent entity but rather acted as Seven-Up's agent, relying upon Seven-Up's personnel resources, sales and promotion techniques, and training courses. It appears that the terms of the Agency Agreement were followed and that final authority for all major decisions, including the right to enfranchise bottlers, remained with Seven-Up. Scott Affidavit, ¶ 11.

Plaintiffs do not directly dispute the facts presented in the Scott Affidavit but rely instead upon the existence of two separate corporations and upon the language contained in Export's articles of incorporation to argue that Export and Seven-Up were not one business enterprise and that the "agency agreement" between the two constitutes a *per*

se violation of § 1 of the Sherman Act. However, we are directed by the Supreme Court to look to substance over form [*United States v. Yellow Cab Co.*, 332 U.S. 218, 227, 67 S.Ct. 1560, 1565, 91 L.Ed. 2010, 2018 (1974)], and while Export and Seven-Up did avail themselves of separate corporate status, Export was the subsidiary and agent of Seven-Up. "To hold otherwise would be to impose grave legal consequences upon organizational distinctions that are of *de minimis* meaning and effect . . . ." *Sunkist v. Winckler & Smith Co.*, 370 U.S. 19, 29, 82 S.Ct. 1130, 1136, 8 L.Ed.2d 305, 312 (1962).

In reaching this conclusion, we are mindful that we are considering the question of the relationship between Export and Seven-Up on a motion for partial summary judgment and that the facts must be viewed in a light most favorable to the party opposing the motion. *Poller v. Columbia Broadcasting System, supra*, 368 U.S. at 473, 82 S.Ct. at 491, 7 L.Ed.2d at 464. However, when we examine plaintiffs' attempt to deny the parent-subsidiary relationship, we find only reliance upon the broad language of Export's articles of incorporation which form the basis of plaintiffs' assertion that Export was a potential competitor of Seven-Up. Plaintiffs ignore that the first stated purpose of Export is to act as an agent for another corporation and focus upon the wording of the other stated purposes which permit Export to "manufacture, purchase, sell, import and export . . . all kinds of syrups. . . ." [¶ Third, Articles of Incorporation, Exhibit B, Plaintiffs' Supplemental Memorandum in Support of Motion for Partial Summary Judgment]. However, we find this language in itself to be insufficient to negate the undisputed facts as to the genesis of Export and to its function as Sev-

---

7. In its preamble, the Agency Agreement describes Export as a corporation "organized with the intent that it act as such general agent for . . . [Seven-Up] in promoting the sale of 7-up . . . in the designated areas. . . ."

8. This paragraph is the basis for plaintiffs' claim that the Agency Agreement constitutes a *per se* violation of the antitrust laws. This assertion is discussed *infra* at p. 641.

en-Up's subsidiary, handling foreign sales and promotion.[9] We note further that we are not involved here with a fledgling lawsuit, in which discovery is just commencing,[10] but rather with an eight year old litigation which is on the eve of trial. Thus, we do not believe that plaintiffs' failure to contradict the Scott affidavit can be explained by a lack of information but rather is attributable to the fact that the Scott affidavit presents data as to which there are no material disputes. Therefore, we conclude that defendants are entitled to partial summary judgment; we hold that Seven-Up and Export constitute one business entity and we dismiss plaintiffs' allegations under § 1 of the Sherman Act in so far as they relate to a conspiracy between Seven-Up and Export. We do not dismiss plaintiffs' allegations that Seven-Up and Export conspired with independent third parties to restrain trade; while the "others" are only identified as bottlers in foreign countries, the allegations are sufficient to require a trial.

█ Our conclusion that Export was a subsidiary of Seven-Up interrelates with our finding that the Agency Agreement between Export and Seven-Up was not a violation of § 1 of the Sherman Act but rather was the formalized expression of why Seven-Up created Export. We note that Export was incorporated on April 26, 1948 and the Agency Agreement was entered into on May 11, 1948. Export never had an independent existence and thus its agreement with Seven-Up did not constitute a contract in restraint of trade between two distinct entities. Therefore, plaintiffs' motion for summary judgment premised upon the Scott agreement as a *per se* violation is denied.

█ We turn now to plaintiffs' other claims for summary judgment. Plaintiffs allege that the agreements between Seven-Up and bottlers in foreign countries, which restrict the territories in which the bottler distributes Seven-Up, is a *per se* violation of the antitrust laws under *United States v. Arnold, Schwinn & Co.*, 388 U.S. 365, 87 S.Ct. 1856, 18 L.Ed.2d 1249 (1967). Defendants admit that their franchise agreements unquestionably limit a bottler to the distribution of Seven-Up within a given territory but argue that *Schwinn* is distinguishable because the holding in *Schwinn* only found that territorial resale restraints were illegal *per se* when title, risk and dominion in the goods was passed to the distributor. Defendants assert that, unlike *Schwinn*, they do not distribute a product for resale but license the right to use a trademark and to sell a concentrate which may only be made into a finished product in accordance with a fixed formula. Further, Seven-Up claims it controls the quality of the soft drinks and the franchisees' ability to use the trademark. Plaintiffs' claim that, despite defendants' characterizations, they do not consign merchandise but rather sell a product—soft drink concentrate—and, while Seven-Up has an interest in maintaining the value of its trademark, that interest is insufficient to permit fixing of territories in which the product can be sold.

The question of whether or not the relationship between Seven-Up and its "developers" (Defendants' Memorandum of Law in Opposition to Plaintiffs' Motion for Summary Judgment at p. 11) is sufficiently close so as to place the developer in a position which is "indistinguishable from those of an agent or salesman of the manufacturer" is (as described by the Supreme Court in *Schwinn, supra*, 388 U.S. at 380, 87 S.Ct. at 1866, 18 L.Ed.2d at 1261) a question of fact. Thus, the language of the agreements

---

**9.** This is not a situation in which two corporations under joint control are in competition with each other [cf. *Kiefer-Stewart Co. v. Joseph E. Seagram & Sons, Inc.*, 340 U.S. 211, 71 S.Ct. 259, 95 L.Ed. 219 (1951)] but rather an instance in which one corporation formed another to operate a portion of its business.

The Second Circuit recently discussed the reach of *Kiefer-Stewart* in *International Railways of Central America v. United Brands*, 532 F.2d 231, at 240 (2d Cir. 1976).

**10.** Compare *Deterjet Corp. v. United Aircraft Corp.*, 211 F.Supp. 348, n. 13 and accompanying text at 351 (D.Del.1962).

between Seven-Up and the bottlers, the admission of territorial restraints [Exhibit A to Affidavit of Lawrence Appel in Support of Motion for Partial Summary Judgment at pp. 6–14], and even the admission in defendants' papers that the bottlers are "independent" in many respects, are insufficient to foreclose all inquiry into the relationship between Seven-Up and its bottlers. The issues of fact to be determined include what control Seven-Up retained over the product and what risks of loss it bore, [See *Eastex Aviation Inc. v. Sperry Hutchinson*, 522 F.2d 1299 (5th Cir. 1975) and *Greene v. General Foods Corp.*, 517 F.2d 635 (5th Cir. 1975)], whether the territorial restrictions were in fact enforced [See *Janel Sales Corp. v. Lanvin Parfums, Inc.*, 396 F.2d 398 (2d Cir. 1968), *cert. denied*, 393 U.S. 938, 89 S.Ct. 303, 21 L.Ed.2d 275 (1968)], what the market conditions were so as to ascertain whether the rule of reason would permit such restriction [See *American Motors Inns, Inc. v. Holiday Inns, Inc.*, 521 F.2d 1230, 1247 (3d Cir. 1975)], and whether the restrictions were so essential to the integrity of the product to permit an exception to the *Schwinn* rule. [See *Copper Liquor Inc. v. Adolp Coors Co.*, 506 F.2d 934 (5th Cir. 1975)].[11] In sum, the application of the *per se Schwinn* rule requires more than generalized statements of the nature of the industry and the nature of the defendants' agreements; plaintiffs have not presented a sufficient record, at this junction, to sustain a holding of *per se* violation.[12] See also *Stan Togut Corp. v. Hobart Manufacturing Co.*, 398 F.Supp. 1323 (S.D.N.Y.1974).

■ Plaintiffs' next claim is that defendants and bottlers agreed to fix the prices of soft drinks and that such agreements constitute *per se* violations under *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 60 S.Ct. 811, 84 L.Ed. 1129 (1940). In support of this claim, plaintiffs present deposition testimony of Leslie R. Scott, a director of Export who admitted that it was normal procedure for Seven-Up to discuss the prices of the soft drink with a bottler and that franchising agreements were not concluded until Seven-Up had established the territorial and the price limitations under which the bottler was to operate. [Exhibit A, Affidavit of Lawrence Appel in Support of Motion for Summary Judgment, pp. 6–14]. While defendants admit that Seven-Up recommended to bottlers that they not charge prices in excess of those charged by other soft drink sellers, Seven-Up claims that bottlers were free to and did charge prices higher than those recommended. Defendants also cite deposition testimony of Scott in which he describes an incident in which a bottler did not follow Seven-Up's suggestions on pricing. [Appendix to Memorandum in Opposition to Plaintiffs' Motion for Summary Judgment, p. 44a]. Whether defendants, in the course of dealing with bottlers, established and enforced uniform prices involves questions of fact which are disputed by the parties; the motion for summary judgment of this issue is denied.

■ Plaintiffs allege that defendants acted in concert with foreign bottlers to destroy Bubble Up bottles; plaintiffs urge that summary judgment be granted in their favor on this issue because the Scott testimony admits that he, as an agent of Export, knew that it was not unusual for Seven-Up bottlers to destroy Bubble Up glass. [Appendix to Affidavit of Lawrence Appel in Support of Motion for Partial Summary Judgment at

---

11. An administrative law judge recently held that territorial exclusivity requirements between Coca-Cola and its bottlers did not constitute unreasonable restraints of trade because, given the unique nature of the soft drink industry, the restrictions were not adverse to the public interest or anticompetitive. *In re Coca-Cola Co.*, 3 CCH Trade Cases, ¶ 21,010 (1975).

12. We note, however, that the Supreme Court has adhered to the holding of *Schwinn* in subsequent cases, [See e. g., *United States v. Topco Association, Inc.*, 405 U.S. 596, 92 S.Ct. 1126, 31 L.Ed.2d 515 (1972)] and that the factual questions mentioned above may not relieve defendants of an eventual finding of a *per se* violation after a full record has been developed.

pp. 63–65]. Defendants argue that the record shows only isolated incidences of such destruction and does not prove that Seven-Up participated in the acts. Whether Seven-Up knew in advance and acted with bottlers to destroy Bubble Up containers is again a disputed question of fact for which a trial is required.

The fourth basis for plaintiffs' motion for summary judgment is the claim that defendants' 80–85% share of the lemon/lime soft drink market constitutes a "world wide monopoly." [Memorandum of Law in Support of Partial Summary Judgment at p. 4]. Defendants dispute this assertion as conclusory, arguing that the critical factual question of what constitutes the relevant market has not yet been established. *See* generally *United States v. E. I. duPont de Nemours & Co.*, 351 U.S. 377, 76 S.Ct. 994, 100 L.Ed. 1264 (1956). Defendants contend that Bubble Up's geographic inclusion of the world is too broad and its limitation of competitors to only those who market lemon/lime soft drinks is too narrow, because lemon/lime drinks do not constitute a separate and unique market product.[13] We agree with defendants that the relevant market,[14] whether or not Seven-Up is predominant within that market, and if Seven-Up is predominant, how its position was obtained raises questions of fact about which the present record is not so clear as to permit summary judgment.[15] *See*

*also Sulmeyer v. Coca-Cola Company*, 515 F.2d 835, 848 (5th Cir. 1975), *rehearing en banc denied*, 520 F.2d 943 (5th Cir. 1975).

Plaintiffs' fifth claim for which they seek summary judgment is that Seven-Up's franchising agreements, which allegedly precluded bottlers from bottling other lemon/lime soft drinks, constitute boycotts which are unlawful *per se*. *See Klor's Inc. v. Broadway-Hale Stores, Inc.*, 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959). Defendants argue that such agreements are reasonably ancillary to the trademark licensure, do not preclude bottlers from cancelling and switching to other lemon/lime concentrates, and are not *per se* unlawful. While the agreements are suspect, given the prominence of Seven-Up,[16] we cannot determine if the agreements are antitrust violations until the relevant market has been defined, the economic leverage of defendants has been established, and the impact of the agreements delineated. *Susser v. Carvel Corp.*, 332 F.2d 505, 516 (2d Cir. 1964),[17] *cert. dismissed*, 381 U.S. 125, 85 S.Ct. 1364, 14 L.Ed.2d 284 (1968). Here again, issues of fact require a trial.

Plaintiffs' remaining claims relate to Seven-Up's activity in Ireland and Seven-Up's patent enforcement litigation. Plaintiffs assert that Seven-Up, acting in concert with the Irish Glass Bottle Company and with prospective

---

13. *See, e. g.*, the Scott deposition, in which he testified that "we were concerned with Coke and Pepsi." Appendix to Memorandum in Opposition to Plaintiffs' Motion for Partial Summary Judgment at p. 43a. *See also* the O'Conner deposition at 33a.

14. Defendants assert that the relevant market for each trading area is comprised of persons "contractually free to and able to bottle . . Bubble Up." [Memorandum in Opposition, p. 15].

15. We note that, even if a large percentage of a market may give rise to a presumption of monopolization, [*see, e. g.* Judge Wyzanski's opinion in *United States v. Grinnell Corp.*, 236 F.Supp. 244 (D.Mass.1964), aff'd in part, 384 U.S. 563, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966)], defendants would still be entitled to an oppor-

tunity to demonstrate that the position was obtained through lawful means. *See* generally A. D. Neale, The Antitrust Laws of the U.S.A., ch. IV (1974).

16. The deposition testimony of Scott is also damaging to defendants' assertions that they did not intend to inhibit competition. *See* Appendix to Affidavit of Lawrence Appel in Support of Motion for Partial Summary Judgment.

17. *Carvel Corp.* presents a very different factual pattern than the present one, in that *Carvel* franchisees sold directly to the public; the need for the public to identify a specific product with a specific name was central to finding the agreements lawful. 332 F.2d at 517. Whether Seven-Up can justify its limiting bottlers to only bottling Seven-Up lemon/lime concentrate remains to be determined.

Bubble Up bottlers, boycotted Bubble Up in Ireland. Plaintiffs also claim that Seven-Up improperly used patent litigation at the request of bottlers in foreign countries who wanted to avoid competition with Bubble Up.[18] Defendants admit that their representatives met with prospective Bubble Up bottlers in Ireland to dissuade them from bottling Bubble Up but argue that the actions were reasonably related to the protection of the Seven-Up trademark because the Bubble Up bottle was an unusually close facsimile of the Seven-Up bottle. Seven-Up also defends its use of trademark litigation as properly brought in good faith and under a colorable claim of right. [*See, e. g.* the Affidavit of Jeremiah McAuliffe, Appendix to Memorandum in Opposition to Plaintiffs' Motion for Partial Summary Judgment at 1a].

It is clear that infringement enforcement, while lawful in itself, may be a part of an unlawful scheme to monopolize and may violate the antitrust laws. *Kobe Inc. v. Dempsey Pump Co.*, 198 F.2d 416 (10th Cir. 1952). *See also Rex Chainbelt, Inc. v. Harco Products, Inc.*, 512 F.2d 993 (9th Cir. 1975), *cert. denied*, 423 U.S. 831, 96 S.Ct. 52, 46 L.Ed.2d 49, 44 U.S.L.W. 3201 (1975) and *Ansul Co. v. Uniroyal, Inc.*, 448 F.2d 872 (2d Cir. 1971), *cert. denied*, 404 U.S. 1018, 92 S.Ct. 680, 30 L.Ed.2d 666 (1972). Further, if the institution of patent enforcement proceedings is part of a purposeful drive to obtain and preserve a monopoly, the fact that a patent is valid and infringed will not preclude a finding of an antitrust violation. *Kobe, supra*, 198 F.2d at 424–425. However, defendants' motivation and purpose are not clear and cannot be ascertained on a motion for summary judgment because this issue of intent[19] requires a full exploration of the factual setting in which the enforcement activities occurred. "A patentee who has reasonable grounds for believing that his patent is valid and that it is being infringed should not lightly be precluded from availing himself of the courts. Whatever other anticompetitive activity the patentee may be guilty of, the patent laws would seem to authorize him to bring such a nonfrivolous suit." *Ansul Co. v. Uniroyal, Inc., supra*, 448 F.2d at 882.

In summary, we grant partial summary judgment in favor of defendants in so far as we find that, as a matter of law, the two named defendants constitute one business entity and therefore cannot conspire with each other. We deny defendants' claims that plaintiffs lack standing to bring this litigation and that this court lacks jurisdiction over the questions. We also deny plaintiffs' motion for partial summary judgment for, while we find much of the deposition testimony presented to raise grave questions about the lawfulness of defendants' activities, we believe that there are material issues of fact which require trial.

SO ORDERED.

18. The deposition testimony of Leslie Scott supports this allegation. *See* Appendix to Affidavit of Lawrence Appel in Support of Motion for Partial Summary Judgment.

19. On the issue of establishing intent for a § 2 violation, see also *International Railways of Central America v. United Brands*, 532 F.2d 231 (2d Cir. 1976).