CITICORP and Citicorp Services, Incorporated, Plaintiffs,

v.

INTERBANK CARD ASSOCIATION et al., Defendants,

v.

CITIBANK, N.A., et al., Counterdefendants.

No. 78 Civ. 1632 (JMC).

United States District Court, S. D. New York.

Oct. 3, 1979.

Rogers & Wells, New York City by John J. Sheehy, James B. Weidner, and James V. Ryan, New York City, for plaintiffs and counterdefendants.

Rogers, Hoge & Hills, New York City by Frank H. Gordon, New York City, and Covington & Burling, Washington, D. C. by Harry L. Shniderman, and James C. McKay, Jr., Washington, D. C., for defendants.

Winthrop, Stimson, Putnam & Roberts, New York City by John B. Daniels, New York City, for third party American Express Company.

## MEMORANDUM AND ORDER

CANNELLA, District Judge:

Motion to dismiss Counts 1 and 2 of defendants' counterclaim, for failure to state a claim upon which relief can be granted, is denied. Fed.R.Civ.P. 12(b)(6).

Motion to dismiss Count 3 of defendants' counterclaim, on the ground that the defendants do not have standing to raise it, is denied.

Motion to strike portions of defendants' counterclaims, as sham and false, is denied. Fed.R.Civ.P. 11.

Defendants' objections, to rulings made by the Honorable Leonard A. Bernikow, United States Magistrate, at a hearing held on October 24, 1978, are dismissed. 28 U.S.C. § 636(b)(1)(A).

Defendants' motion, for an Order placing materials on the public record, is denied.

Jurisdiction in this case is based on 15 U.S.C. §§ 15, 26.

## BACKGROUND

The plaintiffs Citicorp and Citicorp Services Inc. ["CSI"] are Delaware and New York corporations, respectively, both with their principal places of business in New York City. Citicorp conducts a wide range of financial and banking activities, and most pertinent to the instant case, is the issuer of "First National City Travelers Checks," which CSI, its wholly owned subsidiary, distributes and sells.

The defendants Interbank Card Association ["Interbank"] and MCTC Corporation ["MCTC"] are both not-for-profit membership corporations organized under the laws of Delaware, with their principal places of business in New York City. The defendant John J. Reynolds is President and a director of both Interbank and MCTC. Interbank has over 8,000 members, largely commercial banks and other thrift institutions located throughout the United States. It is the owner and exclusive licensor of the service mark "Master Charge" and an accompanying logo, which it has licensed most of its members to use on credit cards. Interbank is governed by a Board of Directors selected by its members.

According to the complaint, some of Interbank's members created MCTC for the purpose of entering the travelers check market. The defendants concede, as they must to uphold MCTC's standing to raise its counterclaim, that Interbank has licensed MCTC to use the "Master Charge" service mark and logo on travelers checks, and that MCTC has definite plans to issue, distribute and sell "Master Charge Travelers Cheques" through the members of Interbank.

A travelers check is a device for payment. Its "issuer" is the company that prints the check and offers it for sale, usually through a bank acting as selling agent. The check, which is customarily issued in various standard denominations of American or foreign currency, is much like a cashier's check in that the issuer is, in effect, drawer and drawee.[1] Upon purchasing a travelers check, the purchaser must sign it in the presence of the selling agent. Then, upon negotiating the check, the purchaser must fill in the date and countersign it in the presence of the person who accepts it as payment. He may also designate that person as payee. The extent of the issuer's promise is to pay on demand the amount indicated by the denomination of the check, provided that the check is properly countersigned, and, in the event that the check is lost or stolen, after having been signed at purchase, but before being countersigned, to provide the purchaser with an immediate refund or replacement.[2]

Although they have been in use since 1891, the legal status of travelers checks remains largely unresolved.[3] They have been characterized as "contracts,"[4] "money,"[5] and various types of "negotiable in-

1. *See* 6 Michie on Banks and Banking 363 (rev. perm. ed. 1975).

2. *See* Hawkland, American Travelers Checks, 15 Buffalo L.Rev. 501, 502–07 (1966).

3. *See id.* at 501.

4. *See id.* at 522; Brady on Bank Checks § 1.6A (1978 Cum.Sup.No. 1).

5. *See Ashford v. Thos. Cook & Sons (Bankers) Ltd.,* 52 Haw. 113, 471 P.2d 530, 42 A.L.R.3d 836 (1970).

> It is common knowledge that any establishment issuing travelers checks intends its checks to be readily and freely passable from one person to another as money. This is not only intended, but it is widely advertised that travelers checks are readily accepted in commerce as money and that they are safer. The public is made to believe that travelers checks are a substitute for money, a medium of exchange, which are self-identifying and accepted everywhere, but, unlike currency, they can be carried without danger of loss or theft because of the protective device of signature and countersignature.
>
> We believe that if travelers checks are intended by the issuer and accepted by the public as a medium of exchange to take the place of money, they should be subjected to the same rules of law applicable to money under like circumstances.
>
> .    .    .    .    .
>
> We therefore hold that travelers checks upon being printed become a medium of exchange or acquire negotiable characteristics and all the risk of theft is with the issuer. The issuer is thus liable to any bona fide holder of stolen travelers checks who has paid valuable consideration.
>
> 471 P.2d at 533–34, 42 A.L.R.3d at 842–43.

struments,"[6] including "cashier's checks"[7] and "certificates of deposit."[8] Fortunately, for the purposes of this case, their commercial attributes are more important than their legal ones. Because they are issued in standard denominations, easily negotiated, and readily accepted worldwide, they are the virtual equivalent of money, but because of the issuer's promise to refund or replace lost or stolen checks, they are safer.

The issuer's gain from the sale of travelers checks derives from two sources. One is a "commission," as much as one percent of the face amount of the check, charged to the purchaser, a portion of which the selling agent retains.[9] The other is the "float," which is the money paid for the checks which remains at the disposal of the issuer until the purchaser negotiates them.[10] An established issuer doing a steady business can expect a steady "float," and thus will have a fairly constant amount of money available for investment. According to one estimate, American Express had a $1.9 billion float at the end of 1977.[11]

The market in United States dollar travelers checks is highly concentrated. Estimates vary, and, of course, ultimate proof on this question must await trial, but many sources suggest that 90% to 95% of the United States dollar travelers checks sold are issued by three companies: American Express, with approximately 55% to 60% of sales; Citicorp, with approximately 20%; and BankAmerica Corp., with approximately 15%. Other issuers with small market shares are Thos. Cook & Son (Bankers) Ltd., Barclays Bank, and Republic Money Orders, Inc.

Citicorp and CSI filed the complaint in this case on April 12, 1978, charging that the defendants' plan to issue and market

Master Charge Travelers Cheques violates sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2, and section 7 of the Clayton Act, 15 U.S.C. § 18. Plaintiffs allege that purchasers of travelers checks ordinarily do not express a strong preference for a particular brand, and that the vast majority of purchasers will actually accept whatever check a selling agent offers them. Since most selling agents are banks that are also members of Interbank, plaintiffs contend that Interbank would be in a unique position to determine the brand purchased by most purchasers of travelers checks. No other issuer would have such power at the "point of sale." According to plaintiffs, the members of Interbank would be able to foreclose competition because 90% of a bank's customers who wish to purchase travelers checks will buy whatever brand the bank favors.

The defendants have counterclaimed against the plaintiffs, and have joined as additional counter-defendants Citibank, N.A., its Senior Vice President David M. Phillips, Citicorp Credit Services, Inc., and Citibank (New York State), N.A. [Hereinafter these parties and the plaintiffs will be referred to collectively as the "Citicorp parties."] Phillips, in addition to being Senior Vice President of Citibank, N.A., has been, at all pertinent times, a director of Interbank.

The counterclaim is divided into three counts. Counts One and Two charge the Citicorp parties with conspiracy "among themselves and with others" to prevent Interbank's and MCTC's entry into the travelers check market. Aside from conclusory allegations, the particular conduct alleged as constituting this conspiracy consists essentially of only six acts or practices: (1) from 1969 through 1977, cooperating with

---

**6.** Official comment 4 of section 3–104 of the Uniform Commercial Code provides: "Traveler's checks in the usual form . . . are negotiable instruments under this Article when they have been completed by the identifying signature."

**7.** *See* 6 Michie on Banks and Banking, *supra*, at 363.

**8.** *See Williams v. Clark,* 202 Misc. 1022, 112 N.Y.S.2d 26, 28–29 (Sup.Ct.Broome Co.1952).

**9.** Some issuers charge no commission.

**10.** *See, e. g.,* Hawkland, *supra,* at 506.

**11.** *Paper War: American Express Co. Braces for Competition in Traveler's Checks,* Wall St.J., Aug. 30, 1978, at 1.

Interbank in the development of Master Charge Travelers Cheques, in the hope of protecting their own "interests in the travelers check field"; [12] (2) when cooperation failed, threatening to sue; [13] (3) publicizing a legal opinion letter that Interbank's and MCTC's proposed entry violated antitrust law; [14] (4) disclosing to a trade publication controlled by American Express a confidential contrary opinion prepared by Interbank's counsel; [15] (5) bringing this suit; [16] and (6) making with CSI's selling agents, which, as noted above, are mostly banks, "discriminatory arrangements and contracts . . . [,] the effect of which is to impede or prevent other financial institutions from entering the travelers check market through the Master Charge Travelers Cheque program." [17] The defendants also allege that Phillips breached his contractual and fiduciary obligations to Interbank by disclosing the confidential legal opinion.

Count Three of the counterclaim alleges that the Citicorp parties have violated antitrust law also by arranging to acquire Carte Blanche Corporation ["Carte Blanche"]. Carte Blanche's principal business is allegedly the issuance of "general purpose credit cards" bearing the "Carte Blanche" service mark and logo, and the provision of services to cardholders and to the merchants who honor the cards. The defendants assert that the acquisition will substantially reduce competition in the general purpose credit card market, as well as the travelers check market, and is therefore prohibited by section 7 of the Clayton Act, 15 U.S.C. § 18.

"General purpose credit cards," according to the counterclaim, are "credentials which provide [their holders] with the right to purchase goods or services on credit at a wide variety of business establishments," as distinguished from credit cards issued by individual companies, such as oil companies, airlines, and large retail chains. Allegedly, "[t]here are only five domestic general purpose credit cards accepted on a national scale by merchants and available to consumers": Master Charge, Visa, American Express, Diners Club, and Carte Blanche.[18]

Like a travelers check, a credit card is a device for payment that is in some ways equivalent to cash. Unlike a travelers check, however, a credit card is also a device for borrowing money. In exchange for goods and services, the cardholder gives the merchant his promise to pay. The "issuer" of the card "in effect finances the merchant's accounts receivable by discounting the sales slips and collecting payment from the cardholder, either at once or on a deferred revolving credit basis." [19]

## DISCUSSION

### Counts One and Two

The Citicorp parties seek dismissal of Counts One and Two of the counterclaim on two grounds. *First,* they argue that their conduct is protected by the so-called *Noerr-Pennington* doctrine, which is essentially a claim that it is protected by the first amendment. *Second,* they assert that since they are subsidiaries and an employee of a single corporate entity, they cannot legally be guilty of conspiracy.

■ In *California Motor Transport Co. v. Trucking Unlimited,* 404 U.S. 508, 92 S.Ct. 609, 30 L.Ed.2d 642 (1972), the Supreme Court summarized the principles of its earlier decisions in *Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.,* 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961), and *United Mine Workers v. Pennington,* 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965):

---

12. Counterclaim ¶ 14 (filed April 28, 1978).

13. *Id.* ¶ 10.

14. *Id.*

15. *Id.* ¶ 11.

16. *Id.* ¶ 12.

17. *Id.* ¶ 13.

18. *Id.* ¶ 20.

19. B. Clark & A. Squillante, *The Law of Bank Deposits, Collections and Credit Cards* 187 (1970).

762

[I]t would be destructive of rights of association and of petition to hold that groups with common interests may not, without violating the antitrust laws, use the channels and procedures of state and federal agencies and courts to advocate their causes and points of view respecting resolution of their business and economic interests *vis-à-vis* their competitors.

404 U.S. at 510–11, 92 S.Ct. at 612. The Court noted, however, that not all conduct that might be characterized as advocacy before legislative, administrative or judicial bodies is automatically protected. That the objective of perjury, fraud, and bribery may be to influence some governmental action can hardly be considered redeeming. *See id.* at 512–13, 92 S.Ct. 609. Consequently, there are exceptions to the rule that resort to governmental bodies is conduct immune from antitrust attack. Where such conduct is a "mere sham to cover what is actually nothing more than an attempt to interfere directly with the business relationships of a competitor . . . application of the Sherman Act would be justified." *Noerr, supra,* 365 U.S. at 144, 81 S.Ct. at 533. Similarly, where the objective of the conduct is "to harass and deter . . . competitors from having 'free and unlimited access' to the agencies and courts," it will not be immune. *See California Transport, supra,* 404 U.S. at 515, 92 S.Ct. at 614.

■ There is an even more fundamental principle of first amendment doctrine which applies here. Where conduct properly proscribed is coupled with conduct protected by the first amendment, the latter does not cure the former. *See, e. g., Ohralik v. Ohio State Bar Ass'n,* 436 U.S. 447, 456, 98 S.Ct. 1912, 56 L.Ed.2d 444 (1978); *Runyon v. McCrary,* 427 U.S. 160, 175–76, 96 S.Ct. 2586, 49 L.Ed.2d 415 (1976); *Cox v. Louisiana,* 379 U.S. 559, 563, 85 S.Ct. 476, 13 L.Ed.2d 487 (1965). As the Supreme Court stated flatly in *California Transport,* "First Amendment rights are not immunized from regulation when they are used as an integral part of conduct which violates a valid statute. . . . [They] may not be used as the means or the pretext for achieving 'substantive evils' . . . which the leg-

islature has the power to control." 404 U.S. at 514–15, 92 S.Ct. at 613–614 (citing *Giboney v. Empire Storage & Ice Co.,* 336 U.S. 490, 69 S.Ct. 684, 93 L.Ed. 834 (1949), and *NAACP v. Button,* 371 U.S. 415, 444, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963)). Thus, an otherwise illegal scheme to restrain competition is not legitimated simply because it includes plans to lobby the legislature, commence a lawsuit, or speak to the press. *See Commerce Tankers Corp. v. National Maritime Union,* 553 F.2d 793, 800 (2d Cir.), *cert. denied,* 434 U.S. 923, 98 S.Ct. 400, 54 L.Ed.2d 280 (1977); *United States v. Braniff Airways, Inc.,* 453 F.Supp. 724, 730–31 (W.D.Tex.1978).

■ The defendants' counterclaim charges that the Citicorp parties entered into discriminatory contracts with the selling agents for First National City Travelers Checks. Although this allegation is rather sparse in detail, the Court finds that, together with allegations of the Citicorp parties' intentions to exclude defendants from the travelers check market, it is sufficient to state a claim upon which relief can be granted. Viewed in a light most favorable to the defendants, the counterclaim alleges that the contracts between the Citicorp parties and the selling agents were designed to prevent or impede new entry into the travelers check market, and that they had that effect. If proven, this could constitute a group boycott violative of section 1 of the Sherman Act. *See, e. g., United States v. General Motors Corp.,* 384 U.S. 127, 86 S.Ct. 1321, 16 L.Ed.2d 415 (1966); *Klor's Inc. v. Broadway-Hale Stores, Inc.,* 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959). Consequently, the counterclaim does not seek to predicate an antitrust violation solely on activity protected by the first amendment, and, therefore, cannot be dismissed on the basis of the *Noerr-Pennington* doctrine.

■ The second ground proffered for dismissal of Counts One and Two of the counterclaim, namely, that commonly-owned corporate entities cannot be held to have conspired with one another, is not the law. In *Perma Life Mufflers, Inc. v. Internation-*

*al Parts Corp.*, 392 U.S. 134, 88 S.Ct. 1981, 20 L.Ed.2d 982 (1968), the Supreme Court held that "since [a corporation and its wholly owned subsidiary] availed themselves of the privilege of doing business through separate corporations, the fact of common ownership could not save them from any of the obligations that the law imposes on separate entities." *Id.* at 141–42, 88 S.Ct. at 1986. As Judge Neaher has aptly summarized:

> As a general proposition, a parent and its subsidiary may constitute independent conspirators for § 1 purposes. . . .
>
> Whether or not the affiliated corporations are competing or non-competing is not dispositive; even non-competing affiliated corporations may act in *concert* to adversely affect free market competition, *e. g.,* by tying one product to another; by compelling restrictive purchase agreements; by fixing maximum resale prices.

*Diehl & Sons, Inc. v. International Harvester Co.*, 426 F.Supp. 110, 116–17 (E.D.N.Y. 1976) (citations and footnotes omitted).

Moreover, the counterclaim alleges that the Citicorp parties entered into discriminatory contracts with selling agents, most of which allegedly are independent banks. Thus, it also alleges a conspiracy with entities that are not Citicorp subsidiaries.

*Count Three*

The Citicorp parties maintain that Interbank lacks standing to complain of the Carte Blanche acquisition, since Interbank does not actually issue credit cards, but merely licenses its members to use the Master Charge service mark and logo on the cards they issue. They rely primarily on *Billy Baxter, Inc. v. Coca-Cola Co.*, 431 F.2d 183 (2d Cir. 1970), *cert. denied*, 401 U.S. 923, 91 S.Ct. 877, 27 L.Ed.2d 826 (1971), in which the Second Circuit held that a franchisor and trademark licensor was an inappropri-ate plaintiff to sue for "damage caused by illegal interference with the marketing of its franchisees' products." *Id.* at 189.

While it is conceded that Interbank does not issue credit cards, it is not conceded that its interest lies merely in the royalties paid by its members. Interbank allegedly provides the promotional and administrative services without which a credit card would be unmarketable. It advertises the Master Charge mark; without such promotion it is doubtful that merchants would honor the card or that customers would carry it, irrespective of who issued it. In addition, Interbank provides data transmission services to its members.[20]

Most important, credit cards are not soft drinks. The value of a card lies not in its inherent qualities, but in the services to which the card entitles its owner. Competition does not cease when a customer chooses a card from among the "big five." Each time a cardholder uses a card to purchase goods and services from a participating merchant, he purchases commodities and services from the credit card organization: goodwill and credit, and remittance and billing services. Not all issuers provide all these services. Apparently, Carte Blanche does. The banks that issue Master Charge cards do not.

It is therefore inaccurate to say that only issuers compete in the "credit card market," because competition is not limited to signing up cardholders. This is further evidenced by the fact that many persons carry more than one card. Interbank, the actual seller of some of the goodwill and services purchased by holders of Master Charge cards, has a substantial interest in preserving competition for these services, and any conduct that tends to diminish that competition would directly injure Inter-

---

**20.** In *Sulmeyer v. Seven-Up Co.*, 411 F.Supp. 635 (S.D.N.Y.1976), Judge Stewart upheld a soft drink franchisor's standing to complain of unlawful marketing and distribution of soft drinks, where it had been shown that the franchisor:

> manufactured concentrates, franchised bottlers, supplied advertising and promotional

material, offered substantial assistance to its franchisees, and was actively involved in supervising the work of the franchisees.

*Id.* at 638. In addition, the franchisor had alleged that the defendants had coerced its potential franchisees to refrain from doing business with it.

764

bank. Thus, Interbank has standing to challenge the Citicorp parties' acquisition of Carte Blanche.

■ As to MCTC, the Citicorp parties point out quite correctly that it does not have standing to complain of conduct aimed at the market for credit card services. Nevertheless, the Court is inclined to uphold its standing on two grounds.

*First,* at this stage of the case, the pertinent product market has yet to be defined. There may be significant "interchangeability of use or . . . cross-elasticity of demand between" credit card services and travelers checks. *See Kennecott Copper Corp. v. Curtiss-Wright Corp.,* 584 F.2d 1195, 1203 (2d Cir. 1978). If so, then a merger between a leading issuer of travelers checks and one of the five major providers of credit card services might be shown to diminish competition in a market that properly includes both products. Such a diminution would directly injure a corporation on the verge of entering the travelers check market.

*Second,* MCTC alleges that Citicorp plans to use Carte Blanche as a vehicle for marketing its travelers checks, which, it is claimed, would raise substantial barriers to new entry in the travelers check market. *See, e. g., FTC v. Proctor & Gamble Co.,* 386 U.S. 568, 579, 87 S.Ct. 1224, 18 L.Ed.2d 303 (1967). At this stage, the Court cannot say that this claim is unprovable. And, while MCTC might be in a position to overcome such a barrier—by exploiting its relationship with Master Charge card issuers—this alone cannot defeat its standing, since it would still have an interest in an unfettered market. The antitrust laws protect *"competition, not competitors." Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,* 429 U.S. 477, 488, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977) (quoting *Brown Shoe Co. v. United States,* 370 U.S. 294, 320, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962)).

*Motion to Strike*

Counts One and Two also allege that David M. Phillips, Senior Vice President of Citibank, revealed a confidential opinion letter, prepared by Interbank's outside counsel, to Phillip Brooke, who was at the time editor of a trade publication entitled *"Action Report." Action Report* is published by Payment Systems, Inc., allegedly a subsidiary of American Express. *Action Report* subsequently published an article written by Brooke which revealed the contents of the letter. The counterclaim further alleges that Phillips was at the time a director of Interbank, and thus had fiduciary obligations not to reveal its confidences.

■ The Citicorp parties have now moved to strike as sham and false the allegations concerning Phillips. They charge that the only basis for the allegations is speculation. Furthermore, they contend that they have proven them false.

The defendant John J. Reynolds, Chief Executive Officer of Interbank, concedes that he has no direct evidence that Phillips or anyone else at Citibank actually released the opinion letter. He does claim to know, however, that Phillips had the letter, and that as an Interbank director, Phillips voted against the Master Charge Travelers Cheque plan for the express reason that it would be detrimental to Citicorp's travelers check subsidiary, CSI. The defendants also claim to have evidence that CSI, although not an Interbank member, had a copy of the opinion letter before its general publication.

The evidence that purportedly proves the falsity of the allegations consists of the following: (1) Phillips' denial; (2) Brooke's refusal to answer questions as to his source; and (3) a Payment Systems Vice President's disavowal of any knowledge of Brooke's source.

Fortunately, all parties agree with Judge Weinfeld's statement of the law in *Murchison v. Kirby:*

A pleading should be stricken only when it appears beyond peradventure that it is sham and false and that its allegations are devoid of factual basis; otherwise it would deprive a party of his right to a trial of the issues posed by his complaint—it would mean trial by affidavits.

27 F.R.D. 14, 19 (S.D.N.Y.1961) (footnotes omitted).

The Court finds that the moving parties have not proven the allegations against Phillips to be false beyond peradventure. Indeed, on the basis of what the parties have presented thus far, the Court cannot discern where the truth lies, which is precisely why this matter should be decided by trial and not affidavit.

*Objections to Magistrate's Discovery Rulings*

Defendants served a subpoena duces tecum on American Express, not a party to this action. Included in their document requests were the following:

(9) All documents referring to any contacts or proposed contacts with the Department of Justice, or any other federal or state agency concerning the Master Charge or VISA travelers checks.

.    .    .    .    .

(19) Studies, reports, surveys or memoranda estimating the size or the expansion of the size of the United States dollar travelers check market.

(20) Studies, reports, surveys, or memoranda estimating the market share or predicting the future market share of any issuer of United States dollar travelers checks.

(21) Studies, reports, surveys or memoranda concerning relevant aspects of travelers checks including but not limited to the 1973 A.C. Nielsen Retailer Attitude Survey and the 1975 A.C. Nielsen Retailer Acceptability Survey.

(22) Studies, reports, surveys, or memoranda concerning consumer acceptance of travelers checks or consumer preference for a particular brand of travelers check.

At a hearing on October 24, 1978, Magistrate Bernikow sustained American Express' objections to all of these requests. Defendants now seek this Court's reconsideration of the Magistrate's rulings.

■ Defendants bear a heavy burden. The Court may reconsider discovery matters referred to a Magistrate pursuant to section 636(b)(1)(A) of Title 28, if the Magistrate's rulings are "clearly erroneous or

contrary to law." Moreover, in resolving discovery disputes, the Magistrate is afforded broad discretion, which will be overruled only if abused. *See Sherrell Perfumes, Inc. v. Revlon, Inc.,* 77 F.R.D. 705, 707 (S.D.N.Y. 1977). In considering, on the one hand, the defendants' need for information, especially information that could help to define the relevant markets in this case, and, on the other, American Express' interests in protecting its privacy and property, the Magistrate's rulings were neither clearly erroneous on the facts nor contrary to law. Accordingly, the Court will not reconsider them.

*Motion to Disclose Confidential Materials*

■ Defendants seek to have various materials produced by the Citicorp parties and others who are not parties to this suit made public. Defendants argue, quite correctly, that even with respect to materials disclosed for pretrial discovery purposes, secrecy is the exception, not the rule. As Judges Brieant and Edelstein have held, those who seek to avoid disclosure of commercial information by a protective order under Rule 26(c) of the Federal Rules of Civil Procedure bear a heavy burden of demonstrating that "disclosure will work a clearly defined and very serious injury." *Reliance Insurance Co. v. Barron's,* 428 F.Supp. 200, 202–203 (S.D.N.Y.1977); *United States v. IBM,* 67 F.R.D. 40, 46 (S.D.N.Y. 1975).

In the instant case, however, the parties—including defendants—and non-parties that have produced materials in response to discovery requests and orders have done so pursuant to a stipulation prohibiting disclosure. This stipulation provides that where one or more of its signatories wishes to disclose any confidential information, and another objects, they may submit their dispute to the Court, which may order disclosure.

■ The stipulation is silent about the standard to be applied to determine whether disclosure is warranted, except that it shall be "for good cause shown." But regardless of what may constitute "good

cause," the Court is constrained to agree with those opposing the defendants' motion that disclosure now is premature. The motion is in large part predicated on the presumption that the Court would need to refer to confidential materials in order to rule on the combined motions now before it. Since this has not turned out to be so, there is no compelling reason to destroy confidentiality, at least not for now.

### CONCLUSION

Accordingly, the motions to dismiss or strike portions of the counterclaim are denied. Defendants' request to place certain materials on the public record is denied, and its objections to Magistrate Bernikow's discovery rulings are dismissed.

SO ORDERED.