**CITICORP and Citicorp Services, Incorporated, Plaintiffs,**

**v.**

**INTERBANK CARD ASSOCIATION et al., Defendants,**

**v.**

**CITIBANK, N.A. et al., Counterdefendants.**

**No. 78 Civ. 1632 (JMC).**

United States District Court,
S. D. New York.

April 22, 1980.

See also, 478 F.Supp. 756.

Rogers & Wells by Joseph H. Spain, New York City, for plaintiffs and counterdefendants.

Rogers, Hoge & Hills by Frank H. Gordon, New York City, and Covington & Burling by Harry L. Schniderman, James C. McKay, Bingham B. Leverich, and Bruce D. Sokler, Washington, D. C., for defendants.

Winthrop, Stimson, Putnam & Roberts by John B. Daniels, David G. Keyko, and Julie D. Fay, New York City, for third-party witness American Express Company.

Hawkins, Delafield & Wood by W. Cullen MacDonald, New York City, and Philip R. Hoffman, Flushing, for third-party witness Barclays Bank International Ltd.

## MEMORANDUM AND ORDER

CANNELLA, District Judge:

Objections by plaintiffs and third-party witnesses to various discovery rulings by the Honorable Leonard A. Bernikow, United States Magistrate, are dismissed. 28 U.S.C. § 636(b)(1)(A).

### BACKGROUND

This is an antitrust action. Plaintiffs Citicorp and Citicorp Services Incorporated seek to block the entry of the defendants Interbank Card Association ["Interbank"] and MCTC Corporation into the market for United States dollar travelers checks, alleging that the defendants' plan to introduce checks bearing the trademark and logo "Master Charge" violates sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2, and section 7 of the Clayton Act, 15 U.S.C. § 18.

The principal theory of plaintiffs' complaint[1] is that most travelers check customers will accept whatever brand a sales agent promotes or "pushes." Because of the nature of the market, most sales agents are banks. Since Interbank is a membership corporation comprising over 8,000 members, largely banks and other thrift institutions, plaintiffs contend that it has a unique relationship with a large majority of available sales agents, and that it can and will exploit that relationship by inducing its members to push Master Charge Travelers Checks. This would injure Citicorp, which issues its own brand of travelers check, as well as any other independent issuer that does not have such a relationship with as many of the available sales agents.

The defendants have counterclaimed that the plaintiffs and others have conspired to prevent the defendants' entry into the travelers check market. Among the practices alleged to constitute this conspiracy are "discriminatory arrangements and contracts" between plaintiffs and their selling agents, "the effect of which is to impede or prevent other financial institutions from entering the travelers check market through the Master Charge Travelers Cheque program." Counterclaim ¶ 13 (filed April 28, 1978). In addition, defendants allege that plaintiffs have engaged in tactics designed to deter banks and other institutions from joining Interbank's travelers check program.

Presently before the Court are objections by third-party witnesses American Express Company ["Amexco"] and Barclays Bank International Ltd. ["Barclays"], as well as objections by the plaintiffs, to various discovery orders of the Honorable Leonard A. Bernikow, United States Magistrate, to whom this case has been referred to hear and determine pretrial discovery matters pursuant to 28 U.S.C. § 636(b)(1)(A). Amexco is the world's oldest issuer of United States dollar travelers checks, as well as the largest, possessing an estimated 55% to 60% of the market. Barclays is a relative newcomer, having entered the market in the early 1960's and never possessing more than 5%. One aspect of its market strategy was to offer its travelers checks without an additional charge or "commission" to be paid by the purchaser.[2] Recently, Barclays decided to cease issuing travelers checks bearing exclusively its own name and trademarks, and to begin issuing travelers checks bearing the name and marks of Visa International, Inc. ["Visa"]. Visa entered the market only within the last year, with a program inviting banks to participate as issuers of Visa Travelers Checks, which is in some ways similar to the defendants' revised program.

The information that is the subject of the instant discovery disputes may be classified

---

1. Although a supplemental complaint has recently been filed, and a supplemental counterclaim will soon be filed, the basic "subject matter involved in the pending action," *see* Fed.R.Civ.P. 26(b)(1), has not changed. In any event, the Court has considered the parties' objections in light of the supplemental pleadings.

2. Some issuers charge the travelers check purchaser a fee or "commission," usually 1% of the face amount of the check. *See Citicorp v. Interbank Card Ass'n*, 478 F.Supp. 756, 760 (S.D.N.Y.1979).

under three broad headings. *First*, the Magistrate has ordered Amexco and Barclays to produce sales and profit data for their travelers check operations, limited to the years 1976 through 1978 for Amexco, and to the years 1972 through 1979 for Barclays. *Second*, the Magistrate has ordered Barclays to produce information directly pertaining to its decision to abandon its efforts to compete in the travelers check market on its own, in favor of joining Visa's program.[3] *Third*, the Magistrate has ruled that Barclays need not disclose information about the travelers check market generally, even though such information may have affected Barclays' decision to join Visa.[4]

3. The Magistrate's Order requires Barclays to produce the following:

1. All documents referring or relating to any actual or proposed study of the Master Charge travelers check program, or to any study of the VISA travelers check program which forms the basis for Barclays' decision to join that program.

2. All documents referring or relating to the market share or market impact of the Master Charge or VISA travelers check program on Barclays' travelers check business in the United States or on competition in the travelers check industry in the United States.

3. All documents referring or relating to any program or plan, final or proposed, of Barclays to compete with, or otherwise to respond to, the Master Charge travelers check program.

4. All documents which compare the selling of Master Charge travelers checks with the selling of Barclays checks, including such comparisons which focus upon the costs and benefits for an agent of selling these brands.

5. Documents sufficient to reveal the executive level sales policy or "pitch" in communications between Barclays and its selling agents concerning the Master Charge travelers check program.

6. All documents referring or relating to the potential market impact in the United States of the Master Charge travelers check program upon the VISA travelers check program and all documents referring or relating to the potential market impact in the United States of the VISA travelers check program upon the Master Charge travelers check program.

7. All documents referring to any agent selling Barclays travelers checks possibly replacing Barclays checks with Master Charge travelers checks.

8. All documents prepared for or prepared by executive officers referring or relating to Barclays' joining the VISA travelers check program and all documents prepared for, or prepared by executive officers which refer to or relate to or form the basis for Barclays' decision to join that program.

9. All documents prepared for or prepared by executive officers referring or relating to Barclays' discontinuing the distribution of Barclays travelers checks or otherwise substituting VISA travelers checks for its own brand of travelers check.

10. Documents sufficient to reveal the executive level sales policy or "pitch" in communications between Barclays and any prospective sales agent of VISA travelers checks issued or distributed by Barclays and the sales contact or "call" reports for nine agents or prospective agents, three such agents randomly selected by Barclays and three such agents selected by each of the parties.

11. Documents sufficient to show the standard compensation programs, including commissions and other benefits, offered by Barclays to agents which sell Barclays travelers checks or to prospective selling agents, and any special compensation plan offered on a general basis to particular agents, but not documents which show the compensation offered as a result of individual negotiations to gain a particular agent.

12. Documents sufficient to reveal any actual or generally offered change in the particular, standard or special compensation offered to agents which sell Barclays travelers checks as referred to in paragraph 11 above.

13. Documents sufficient to reveal any actual or generally offered change in the particular, standard or special commission or suggested commission charged to customers by selling agents on the sale of Barclays travelers checks or of VISA travelers checks or of Master Charge travelers checks.

14. All documents referring or relating to the size of the United States travelers check market and any anticipated growth or decline in that market attributable to the Master Charge or VISA travelers check program.

15. All documents prepared for or prepared by executive officers subsequent to January 1, 1978, which refer or relate in any way to any aspect of the proposed MCTC travelers check program or to a proposed MCTC travelers check.

4. Specifically, the plaintiffs object to the Magistrate's refusal to order production of the following:

A. All documents prepared for or prepared by executive officers referring or relating to the impact or effect on the sale of a brand of travelers checks by any selling agent when that agent adds another brand of travelers check to its inventory for sale to consumers.

B. All documents prepared for or prepared by executive officers referring or relating

In support of their objections that they have been ordered to produce too much, Amexco and Barclays raise essentially three arguments: (1) that the information lacks relevancy; (2) that, because of the sensitivity of such data, disclosure should not be required at this stage of the proceedings, if at all; and (3) that no issuer should be required to produce such data before all other issuers are also required to do so. In support of their objections that they have been allowed to discover too little, plaintiffs argue that the information is relevant and would not be much of a burden for Barclays to produce. Defendants make no objections to the Magistrate's rulings, and seek to oppose the objections of the plaintiffs and third-party witnesses.[5]

## DISCUSSION

[1] As the Court has already noted in this case, parties seeking to overturn the Magistrate's discovery rulings "bear a heavy burden":

> The Court may reconsider discovery matters referred to a Magistrate pursuant to section 636(b)(1)(A) of Title 28, if the Magistrate's rulings are "clearly erroneous or contrary to law." Moreover, in resolving discovery disputes, the Magistrate is afforded broad discretion, which will be overruled only if abused. *See Sherrell Perfumes, Inc. v. Revlon, Inc.*, 77 F.R.D. 705, 707 (S.D.N.Y.1977).

*Citicorp v. Interbank*, 478 F.Supp. 756, 765 (S.D.N.Y.1979). Such broad discretion is necessary, because in resolving discovery disputes no one factor is controlling. The Magistrate must balance the parties' need for the information sought, which depends considerably on the availability of alternative sources for it, against the witness' burden in producing it and exposure to irreparable harm. *See, e. g., Maritime Cinema Service Corp. v. Movies En Route, Inc.*, 60 F.R.D. 587, 590 (S.D.N.Y.1973). With these considerations in mind, the Court will turn to the various objections.

*First*, neither Amexco nor Barclays has convinced the Court that it is being unfairly singled out for discovery. Both must reveal sales and profit data, and there is nothing to controvert the parties' representation that similar disclosures have been or will be demanded from other issuers. As to requests directed specially to Barclays concerning its decision to forego its own exclusive operations and join Visa's program, any difference in treatment would appear to arise from Barclays' unique status in that regard.

*Second*, the danger that either of the witnesses will suffer irreparable harm has been minimized by the entry of a strict protective order governing all disclosures of confidential information.[6] To be sure, it is still possible that some confidential information will find its way to the public, or, even more to the point, into the hands of competitors. The Court recognizes that some of the information in question may be highly sensitive, and that its misuse by a competitor would probably injure its supplier. But it is not the magnitude of the harm

to the total amount and percentage of travelers checks sold in the United States at commercial banks, thrift or other financial institutions.

    C. All documents prepared for or prepared by executive officers referring or relating to the ability of the travelers checks sales agents to control or otherwise influence the brand of travelers check sold to consumers.

    D. All documents prepared for or prepared by executive officers referring or relating to the number of brands of travelers checks that a selling agent is able to stock or will stock in its inventory and offer for sale to consumers.

    E. All documents prepared for or prepared by executive officers referring or relating

to the requirements for entry by a new travelers check issuer into the United States market.

5. In passing upon the instant objections to the Magistrate's rulings, the Court has not needed to consider the defendants' opposition to plaintiffs' objections, and thus it has not been necessary to decide whether defendants have standing on this point.

6. There have been different protective orders approved in this case, any of which are available to the parties or third-party witnesses as a means of protecting their interests. The strictest of these orders is reproduced as Appendix A.

itself that must be weighed; rather, it is the likelihood of such harm's occurring, which the Court finds to be relatively small here. The Court will not readily assume that the attorneys who sign the protective order, and who must "scrupulously maintain the security of" confidential information disclosed under it will ignore their duties or fail to impress the seriousness of them on all others who are permitted access to such information.

*Third,* relevancy for the purposes of pretrial discovery has been interpreted broadly. Rule 45(d)(1), which governs discovery of documents and things from a non-party witness, expressly incorporates Rule 26(b)(1), which governs discovery from parties. *See In re Wheat Farmers Antitrust Class Action,* 440 F.Supp. 1022, 1025 (D.D.C. 1977). Rule 26(b)(1) provides:

> Parties may obtain discovery regarding any matter, not privileged, which is relevant to the subject matter involved in the pending action . . . . It is not ground for objection that the information sought will be inadmissible at the trial if the information sought appears reasonably calculated to lead to the discovery of admissible evidence.

And, as the Supreme Court recently noted:

> The key phrase in this definition—"relevant to the subject matter involved in the pending action"—has been construed broadly to encompass any matter that bears on, or that reasonably could lead to other matters that could bear on, any issue that is or may be in the case.

*Oppenheimer Fund, Inc. v. Sanders,* 437 U.S. 340, 351, 98 S.Ct. 2380, 2389, 57 L.Ed.2d 253 (1978).

Given the breadth of this test, the Court concludes that all of the information that Amexco and Barclays have been ordered to produce, as well as the information that the Magistrate has ruled Barclays need not produce, is within the scope of discovery. As the Court has already commented in an earlier Memorandum and Order:

> Amexco is the nation's largest issuer of United States dollar travelers checks. It would therefore be nearly impossible for the parties in this case to analyze and define the relevant market without information that only Amexco can provide.

Memorandum and Order at 2 (filed Nov. 5, 1979). And although Barclays is not nearly as overwhelming a force in the market, its data may turn out to be quite important. Barclays' relatively brief experience as an independent issuer, the emergence of Visa as a significant competitor, and Interbank's efforts to establish itself as an issuer, evince a changing market that is very different today from what it was a few years ago, and from what it may be a few years hence. Any analysis of the travelers check market for the purposes of this case, therefore, must take these differences into account, and use all available data to project the probable impact of current and impending developments. The reasoning of a competitor that abandons its independent efforts in favor of joining another competitor may help to explain the forces that are shaping competition, and is thus significant.

Additionally, the information pertaining to Barclays' recent decision to join Visa may very well turn out to bear on issues raised in the counterclaim, namely, whether plaintiffs did unlawfully attempt to deter banks from joining defendants' program, and, if so, the effect of such efforts. Similarly, the compensation arrangements between Barclays and its sales agents may bear on defendants' contention that plaintiffs made discriminatory contracts with their own sales agents.

The general information about the travelers check market sought from Barclays by plaintiffs is also likely to bear on the reasons for Barclays' decision to join Visa, albeit somewhat less directly. In addition, such disclosures appear reasonably likely to lead to the discovery of evidence on the central thesis of plaintiffs' complaint, namely, that most customers will accept whatever brand a sales agent pushes.

This leaves burden of production, which is largely difficult to gauge. Discovery is generally burdensome. Only where it is exceptionally or unnecessarily so will this be a basis for its denial or limitation. The

Court believes that the Magistrate has struck a fair balance in limiting the discovery to sales and profit data, and the more specific information pertaining to Barclays' reasons for joining Visa, and in declining to order discovery of more general information about the travelers check market that Barclays may possess. Even though the latter is within the proper scope, the plaintiffs' need for it cannot be as great, since there are no doubt numerous alternative sources for such general information.

■ This is not to say that the Court, if confronted with the dispute in the first instance, would have chosen to draw the line in the same place. But since the Court believes the Magistrate's decision to be well within the bounds of discretion, it will not reconsider it at this time. If, just before or during the trial, the plaintiffs can persuade the Court that such information is particularly relevant, and not reasonably available from any alternative source, they may renew their application, and, the Court will reconsider it at that time.

The Court cautions the parties, however, that it does not view such a renewed application, or, for that matter any further discovery, as good cause for adjourning the trial date that has been set. The Court fully expects the parties to be ready to proceed to trial on June 2, 1980. Moreover, in light of the voluminous discovery that appears to have taken place thus far, the Court admonishes the parties to make every effort to stipulate all facts not genuinely in dispute, before the Magistrate.

## CONCLUSION

Accordingly, the Court finds the Magistrate's rulings to be neither clearly erroneous nor contrary to law; nor have they been shown to be an abuse of discretion. 28 U.S.C. § 636(b)(1)(A). Therefore, the Court declines to reconsider them, and the objections are dismissed.

SO ORDERED.

## APPENDIX A

REVISED PRETRIAL PROTECTIVE ORDER GOVERNING DISCLOSURE OF CRITICAL, PROPRIETARY INFORMATION

1. This Order shall govern the production of documents and other discovery relating to critical, proprietary information the disclosure of which could cause serious, irreparable commercial harm to the producing party or witness.

2. To safeguard the confidentiality of critical, proprietary information the following procedures will be strictly adhered to:

(a) Outside counsel of record for the party or parties receiving such information, including all partners, associates or employees ("recipient counsel") and their experts designated in accordance with the May 4, 1978 Stipulation and Protective Order, including all officers, partners or employees of such experts ("recipient counsel's experts") will be bound by the terms of this Order.

(b) Recipient counsel will designate in writing an attorney from among those who are outside counsel of record for the party who will be custodian of all materials produced subject to the terms of this Order. The name of this custodian must be transmitted to the other parties and to the Court prior to the production of any critical, proprietary information.

(c) To invoke the protections of this Order, each page of each document containing critical, proprietary information will be marked by the producing party or witness with the legend:

"CONFIDENTIAL: CRITICAL PROPRIETARY INFORMATION. NOT TO BE REPRODUCED."

One copy of each document so designated shall be delivered to the custodian designated pursuant to paragraph 2(b) hereof. The custodian will be bound to scrupulously maintain the security of any such document so produced, and to ensure that the terms of this Order are strictly adhered to.

(d) Neither recipient counsel nor recipient counsel's experts shall duplicate or reproduce, in any way, for any reason, or cause or allow to be so duplicated or so reproduced, any document designated, as containing critical, proprietary information.

(e) All notes, memoranda, reports and other written communications (the "notes") that reveal or discuss information contained in documents produced, testimony given or interrogatories propounded or answered in accordance with the terms of this Order must be stamped or otherwise marked on each page with the legend:

"CONFIDENTIAL: CRITICAL PROPRIETARY INFORMATION. NOT TO BE REPRODUCED EXCEPT BY [Custodian]."

The custodian designated pursuant to paragraph 2(b) hereof shall keep and scrupulously maintain the security of all such notes. The custodian will also maintain an up-to-date list of all such notes created, specifying the author, recipient (if any), date, number of existing copies and number of pages constituting each such note. This list will be given to outside counsel of record for the producing party or witness ("producing counsel") at the time of delivery of the affidavit of destruction pursuant to paragraph 9(c) hereof.

(f) Recipient counsel and recipient counsel's experts will be permitted to disclose the contents or a description of the critical documents only to each other and to discuss such contents, description or notes only with each other, except as provided in paragraph 3 hereof.

3. If recipient counsel desires to question the producing party or witness, or its employees, about the contents of any of the documents containing critical proprietary information, such questioning must be done through the use of separate and distinct procedures:

(a) If such questioning is to be done through written interrogatories, the interrogatories must be served and filed under seal and must bear the designation

"CONFIDENTIAL: CONTAINS CRITICAL PROPRIETARY INFORMATION. NOT TO BE REPRODUCED."

Each copy of the interrogatories must be numbered, and the serving party must maintain a list of the distribution of each numbered copy. The answers will be served, filed, designated and numbered in the same manner as prescribed for the interrogatories. Recipient counsel shall not duplicate or reproduce the numbered interrogatories or answers. The custodian designated pursuant to paragraph 2(b) hereof shall keep such interrogatories and answers under seal throughout this litigation and scrupulously maintain the security of such documents;. or the interrogatories may be filed with the Court under seal according to the terms of paragraph 4 hereof.

(b) If questioning is to be done at a deposition of the producing party or witness, or its employees, about any document designated in accordance with paragraph 2(c) hereof, recipient counsel shall notify producing counsel by telephone or letter at the time the deposition is noticed, or as otherwise agreed by the parties hereto, of the identity of any such document concerning which recipient counsel intends to ask questions. Producing counsel will undertake to bring a copy of such document to the deposition for the use of the witness. The reporter at the deposition must be instructed to record the questions concerning the critical, proprietary information in a separate transcription (the "separate transcript") from the transcript of questions and answers covering other documents or subjects. If the questioning on a document containing critical information or its contents comes in the midst of questioning on other documents or subjects, the ongoing transcript will be suspended and a new separate transcript will be begun. At the completion of questioning on a critical document, the resumption of questions on other subjects may be recorded in the previously suspended tran-

script. Only one copy of the separate transcript may be produced by the reporter for each party. The original separate transcript shall be sent to the attorney for the witness for execution and returned to counsel taking the deposition in accordance with the Federal Rules of Civil Procedure. Each separate transcript, including the original, must bear on its face the designation set out in Paragraph 3(a) above, and no party may duplicate or reproduce a transcript so designated. Upon receiving the separate transcript, each party must stamp or otherwise mark each page of the separate transcript, including the original transcript, with the notation: "THIS PAGE NOT TO BE REPRODUCED." The original separate transcript, after execution, shall be kept by the custodian designated pursuant to paragraph 2(b) hereof under seal throughout this litigation, and the security thereof scrupulously maintained; or the separate transcript may be filed with the Court under seal according to the terms of paragraph 4 hereof.

(c) The contents of interrogatories, answers and separate transcripts designated hereunder may be disclosed only to the parties' outside counsel of record and experts for the parties duly designated in accordance with the May 4, 1978 Stipulation and Protective Order, who will be similarly bound to protect the confidential nature of the information disclosed to them.

4. Documents and information covered by this order need not be filed with the Clerk of this Court; however, all separate transcripts of depositions, exhibits, answers to interrogatories and other documents and materials, or portions thereof, including briefs, filed with the Court pursuant to or deriving from the pretrial discovery of either party comprising or containing critical material, or information taken therefrom, shall be filed in sealed envelopes or other appropriately sealed containers on which shall be endorsed the title of this action, an indication of the nature of the contents of such sealed envelope or other container, the words:

"CONFIDENTIAL: CRITICAL, PROPRIETARY INFORMATION" and a statement substantially in the following form:

"THIS ENVELOPE CONTAINS DOCUMENTS WHICH ARE FILED IN THIS CASE BY [NAME OF PARTY]. PURSUANT TO A PRETRIAL DISCOVERY ORDER HEREIN, THIS ENVELOPE IS NOT TO BE OPENED NOR THE CONTENTS THEREOF TO BE DISPLAYED, REVEALED OR MADE PUBLIC, EXCEPT BY THE AUTHORITY OF THE COURT."

5. Prior to the review of the critical, proprietary information by any of recipient counsel's experts and prior to any disclosure of the contents or description of the critical documents by recipient counsel to any of its experts, whether written or otherwise, each of the recipient counsel's experts who is to review the critical, proprietary information or to have such information disclosed to him or her, shall execute a written agreement, in the form annexed hereto as Exhibit A.

6. No person shall make public disclosure of any critical information or material obtained pursuant to pretrial discovery in this action without further order of the Court for good cause shown, or as stipulated by and between producing counsel and recipient counsel.

7. No person shall make use of any critical information or material obtained pursuant to pretrial discovery in this action, other than for purposes of this litigation, unless further order of the Court is obtained for good cause shown, or as stipulated by and between producing counsel and recipient counsel.

8. Any specified part or parts of the restrictions imposed by paragraphs 1 through 7 may be terminated at any time by a written stipulation by and between producing counsel and recipient counsel, or by an order of this Court for good cause shown.

9. (a) No later than 5 days after final termination of this litigation, unless otherwise agreed to in writing by producing

counsel, recipient counsel's experts shall be under an obligation to deliver to the custodian designated pursuant to paragraph 2(b) hereof all documentary and other physical material describing, discussing, analyzing or otherwise disclosing information which is covered by the terms of this Order. Each of recipient counsel's experts that has reviewed or otherwise had disclosed to him or her in accordance with the terms of this Order, critical, proprietary information shall execute an affidavit of compliance with this Order and of delivery of documents, in the form attached as Exhibit 1 to Exhibit A, annexed hereto.

(b) No later than 10 days after final termination of this litigation, unless otherwise agreed to in writing by producing counsel, the custodian designated pursuant to paragraph 2(b) hereof shall be under an obligation to producing counsel and to this Court to destroy all documentary and other physical material describing, discussing, analyzing or otherwise disclosing information which is covered by the terms of this Order. The custodian shall execute and deliver to producing counsel an affidavit of destruction in the form annexed as Exhibit B hereto.

(c) The material referred to in paragraphs 9(a) and (b) hereof includes, but is not limited to, any and all notes, memoranda, reports or other written communications or documentation referred to in Paragraphs 2(e), 3(a) and 3(b) hereof, and other physical material, in the possession of any person to whom disclosure was made by recipient counsel of any information covered hereunder. The material referred to in paragraph 9(b) hereof does not include the actual documents designated by the producing party or witness and delivered to the designated custodian as provided in paragraph 2(c) hereof.

10. No later than 10 days after final termination of this litigation, unless otherwise agreed to in writing by producing counsel, recipient counsel shall be under an obligation to return to producing counsel all documents designated and delivered pursuant to the terms of paragraph 2(c) hereof.

11. At the completion of this litigation each partner, associate, or employee of recipient counsel that has reviewed or had disclosed to him or her in accordance with the provisions of this Order, critical, proprietary information, shall execute an affidavit of compliance with this Order, substantially in the form annexed hereto as Exhibit C.

12. The initial designation of a document for protection under this Order, pursuant to paragraph 2(c) hereof, and each of the restrictions of this Order, may be terminated only by written stipulation executed by and between producing counsel and recipient counsel, or by an order of this Court, the designating party or witness bearing the burden of proof of establishing that the document contains critical, proprietary information. The termination of the action shall not terminate these limitations on disclosure of critical, proprietary information.

SO ORDERED:

Dated: New York, New York
        July 16, 1979

(as of June 14, 1978, date of first special protective order)

### EXHIBIT A

#### PROMISE OF CONFIDENTIALITY

STATE OF           )
                    :   ss.:
COUNTY OF        )

                            , being duly sworn, deposes and says:

I have read and am familiar with the terms of the Protective Order Governing Disclosure of Critical, Proprietary Information, in the case of *Citicorp et ano. v. Interbank Card Ass'n, et al.*, 87 F.R.D. 43 (S.D.N.Y.1980) and I agree to abide by all the terms of said Order and not to reveal or otherwise communicate any of the information disclosed to me pursuant thereto to anyone except in accordance with the terms of said Order. I agree not to make use of any information or material obtained pursuant to pretrial discovery, other than for purposes of this litigation.

I also agree to deliver to outside counsel of record that has engaged me for this action, not later than five days after the termination of this litigation, any and all documents in my possession containing critical, proprietary information which is the subject of said Order (whether such documents be notes, memoranda, reports or other written communications or documentation prepared by any person at any time containing critical, proprietary information covered by the terms of said Order). I further agree to execute an affidavit of delivery of all documents and of compliance with said Order, in the form annexed hereto as Exhibit 1, no later than five days after the termination of this litigation.

Sworn to before me this ____ day of ____, 19__.

_____
Notary Public

### EXHIBIT B

### AFFIDAVIT OF DESTRUCTION

STATE OF _____ )
                          :  ss.:
COUNTY OF _____ )

_____ , being duly sworn, deposes and says:

The documents described below have this (Date) day of (Month) , 19 , been destroyed under my direct supervision and in my presence by (Method) by (Name), a person in the employ of the law firm of (Name):

| Author | Recipient | Date | No. of Pages |
| --- | --- | --- | --- |

The above list represents all notes, memoranda, reports or other written communications or documentation containing critical, proprietary information, which information is covered by the terms of the Protective Order Governing Disclosure of Critical, Proprietary Information, in the case of *Citicorp, et ano. v. Interbank Card Ass'n, et al.*, 87 F.R.D. 43 (S.D.N.Y.1980). The above list does not include documents designated and delivered in accordance with paragraph 2(c) of said Order. Defendants' (or Plaintiffs') outside counsel of record no longer have in their possession any documents containing critical, proprietary infor-

mation covered by the terms of said Order, and have neither knowledge nor reason to believe that anyone to whom they disclosed such information, or caused or allowed such information to be disclosed, has possession of any such documents.

Sworn to before me this ____ day of ____, 19__.

_____
Notary Public

### EXHIBIT C

### AFFIDAVIT OF COMPLIANCE WITH ORDER

STATE OF _____ )
                          :  ss.:
COUNTY OF _____ )

_____ , being duly sworn, deposes and says:

I have read and am familiar with the terms of the Protective Order Governing Disclosure of Critical, Proprietary Information, in the case of *Citicorp, et ano. v. Interbank Card Ass'n, et al.*, 78 Civ. 1632 (JMC), dated June __, 1979. I have faithfully complied with the terms of said Order and am unaware of any manner in which said Order has been violated by anyone else.

I have returned to outside counsel of record for each party or counsel for each witness producing critical proprietary information any and all documents in my possession delivered to me under the terms of said Order.

Sworn to before me this ____ day of ____, 19__.

_____
Notary Public

### EXHIBIT 1

### AFFIDAVIT OF COMPLIANCE AND DELIVERY OF DOCUMENTS

STATE OF _____ )
                          :  ss.:
COUNTY OF _____ )

_____ , being duly sworn, deposes and says:

I have read and am familiar with the terms of the Protective Order Governing Disclosure of Critical, Proprietary Information, in the case of *Citicorp, et ano. v. Interbank Card Ass'n, et al.,* 87 F.R.D. 43 (S.D.N.Y.1980). I have faithfully complied with the terms of said Order and am unaware of any manner in which said Order has been violated by anyone else.

I have delivered to outside counsel of record any and all documents in my possession containing critical, proprietary information which is the subject of said Order (including documents and notes, memoranda, reports or other written communications or documentation prepared by any person at any time containing critical, proprietary information covered by the terms of said Order). I understand and agree that my obligation not to reveal or otherwise communicate any information disclosed to me pursuant to the terms of said Order continues beyond the termination of this litigation.